CHALLENGER, Inc., Appellant,

v.

Robert S. DURNO, Appellee.

No. 15336.

United States Court of Appeals
Fifth Circuit.

Dec. 9, 1955.

Rehearing Denied Jan. 10, 1956.

Jacob Rassner, New York City, Franklin S. Dodd, Brownsville, Tex., for appellant.

Paul Y. Cunningham, Brownsville, Tex., Sharpe, Cunningham & Garza, Brownsville, Tex., for appellee.

Before HUTCHESON, Chief Judge, and TUTTLE and BROWN, Circuit Judges.

BROWN, Circuit Judge.

Durno (Libelant—Appellee) after inspection of the vessel in its run-down state virtually abandoned in the port of Belize, British Honduras, and personal verification that "the boat had no value * * * practically no value", failing in his effort to buy the shrimp vessel Challenger for $4,500.00, then purchased on June 6, 1952, for the sum of $3,000.00 the outstanding promissory note of the face amount of $9,000.00 (then in substantial default) together with the Preferred Ship Mortgage, 46 U.S.C.A. § 922, previously executed by the vessel owner, Challenger, Inc. (Appellant). It was his hope, later unfulfilled, that with an additional $1,500.00, he could acquire all of the outstanding stock of the owner corporation and thus obtain effectual ownership. The vessel continuing unattended, he took possession as Mortgagee[1] on June 13, 1952, with the intention, later declared if not adequately revealed at the time, of bringing the vessel to the United States for foreclosure of the Mortgage. Sixteen months and $21,-246.02 later, this modern Odyssey ended when the vessel finally made the Port of Brownsville, Texas, where a libel *in rem* seeking foreclosure of the Preferred Ship Mortgage debt and this additional sum was filed by him.

The Libelant claimed that all of these amounts totaling $21,246.02 were reasonably and necessarily expended by him as Mortgagee in possession for repairs and maintenance to preserve the vessel as such, thereby preserving the mortgage security, and to enable the vessel to navigate with safety to a United States Port for effectual enforcement of the Preferred Ship Mortgage in an Admiralty Court. Challenger, Inc., as Claimant, acknowledged liability for the unpaid balance (approximately $4,000.00) of the mortgage debt, interest and. attorney's fees, but, vigorously disputing reasonableness, necessity, or both, of the asserted repairs, contended that the Mortgagee's possession was, or became on use and conduct manifesting the dominion of a general owner of the vessel, tortious so that under the equitable doctrine of accession, E. E. Bolles Wooden Ware v. United States, 106 U.S. 432, 1 S.Ct. 398, 27 L.Ed. 230; Pine River Logging & Improvement Co. v. United States, 186 U.S. 279, 22 S.Ct. 920, 46 L.Ed. 1164; United States v. Pan-American Petroleum Co., 9 Cir., 9 F.2d 761, 24 F.2d 206, no recovery, even assuming addition to the value of the vessel, could be awarded.

Abhorring the alternate prospect that the owner, financially incapable or unwilling to care for the vessel, might thereby reap substantial improvements as a windfall, or that the apparent Mortgagee might, in loading down the vessel with exorbitant charges, be using his

---

1. The Mortgage was on an ordinary Customs Form 1348 (October 1951) Mortgage of Vessel. The word "Preferred" was typed into the heading, an affidavit of Good Faith was appended and despite its brevity (compare typical form Benedict On Admiralty, 6th Ed. Vol. 1, p. 181, especially Articles XI, XVI, XVII, XVIII, XIX, XX) the pleadings reflect agreement that the requirements of 46 U.S.C.A. § 921, concerning indorsement, filing, etc. were met.

It provided that if Mortgagor " * * negligently or wilfully permit said property to waste, or be damaged or destroyed * * * [the Mortgagee is] hereby authorized to take possession of said goods, chattels * * * at any time, wherever found * * * and to sell and convey the same * * * to satisfy the said debt, interest and reasonable expenses, after first giving a notice of thirty (30) days, to be given by publication in some newspaper published in Miami, Dade County, Florida * * *."

While Libelant took possession under this right, he never attempted to consummate foreclosure by this route.

status as a means of achieving the ownership previously denied him, the Trial Court rejected the course plotted by each and set sail on one somewhere in between. Proceeding in the foggy uncertainties of this record by juridical deadreckoning, the Judge declared that the repair charges were extravagant, could not be allowed in the amount claimed, and the vessel owner should be credited with a specified value for the use of the vessel during a four-month period when Libelant put the ship to use in the lobster tail business. Except for some deviation not adequately taken into reckoning, and which we correct, we think his charted course was proper.

The Mortgagee took possession June 13, 1952. No repairs of consequence were undertaken until the arrival of "Captain" Bartlett in mid July. The repairs then done to the hull were not substantial, although sufficient, in his judgment, to permit the vessel to proceed to the United States. One engine concededly was in disrepair with one cylinder blanked out, the other engine capable of moving the vessel in short legs along the coast but in need of overhaul and considerable spare parts. Apparently claiming that it would take considerable time to procure and install the needed machinery parts, the Libelant used the vessel as floating refrigerator storage in the lobster tail business beginning about August 1952 for three or four trips of one each. Since the vessel, in these operations, was afloat on the fishing grounds, no repairs were or could have been undertaken during that time. Though on Libelant's calculations the venture was unprofitable, we join in the Trial Court's view that his records defied orderly analysis, but that the vessel owner was nevertheless entitled to compensation for this use. He fixed it at $500.00 per month, a figure we accept since not effectively challenged by the Appellee by appropriate cross appeal.

On December 31, 1952, the vessel finally departed Belize, proceeding closely up the coast some 600 miles, arriving Carmen, Campeche, Mexico, January 9. This voyage, apparently uneventful, did take perhaps twice as long as normal. If serious efforts were actually made there for any additional repairs, it was soon known that with the shortage of shipyard facilities, they could not be accomplished. While the vessel thus languished at Carmen, the Mexican port authorities, apparently on the complaint of a crew member, declined clearance on the ground that the vessel was unseaworthy. Special permission, however, was obtained to proceed March 1, 1953, to nearby Frontera where the vessel remained from March 2, 1953, to October 27. Here extensive repairs to hull and machinery described by "Captain" Bartlett as, "the first general repairs" since taking possession were performed. While here there were apparently numerous skirmishes, the owner demanding, the Mortgagee declining, the return of the vessel, the filing of legal proceedings with Mexican authorities by representatives of the vessel owner against the Mortgagee, and the seizure of the vessel for asserted maritime liens ·for approximately $7,-200.00 by a shipyard for materials, advances and work done on behalf of Libelant on the orders of his agent Bartlett. Libelant paid and took an assignment of this purported maritime lien, the vessel was immediately released and on October 27 sailed for Brownsville some 500 miles away, arriving there October 31, 1953.

■■ At the outset it is clear that despite the claim and some expressions in the Court's findings and decree speaking of "maritime liens" Libelant's recovery depends entirely on the Preferred Ship Mortgage. Whatever may have been the rights of innocent materialmen, ship repairers, and others supplying these things to the vessel and whether, here, those rights would be determined by the law of Honduras, Mexico (unproved), or the American Maritime Lien Statute, 46 U.S.C.A. § 971 et seq., Libelant, as a Mortgagee in possession could not create maritime liens in his own favor, The Pauline, D.C.S.D.N.Y., 136 F. 815; Cf. Ruth E. Merrill, 2 Cir., 286 F. 355; The San Francisco, 4 Cir., 179 F.2d 284, 290, 1950 AMC 436, 444, and had, at most,

only the contract right to subject the vessel to such contract charges as were convincingly essential to the preservation of the *res* as security. 59 C.J.S., Mortgages, § 329 b, p. 455; 14 C.J.S., Chattel Mortgages, § 188, pp. 797, 798. He would not have, for example, that right of one to whom management has been entrusted, 46 U.S.C.A. § 972, to procure all those services, supplies, etc., which might be useful and generally required for vessel operations.[2] Having this restricted right, he cannot enhance his position by asserting that he stepped into the shoes of those whose liens (assumed) were paid off with his money because the law charges him with knowledge that he did not have authority to procure them generally. He cannot insulate himself from his own knowledge. Miss Nassau, 5 Cir., 55 F.2d 571, 1932 AMC 267, 271; The Gaston, 5 Cir., 91 F.2d 293, 1937 AMC 1259, 1265; The Maret, 3 Cir., 145 F.2d 431, 1944 AMC 1203.

■ Tested in this approach, how much of these charges, how many of these innumerable items, were really essential in point of need to preserve security and reasonable in point of cost was patently a question of fact—so much so that the parties literally left the Judge with several large boxes of receipts, invoices, records and papers to work out as best he could with virtually no aid from oral testimony which was invariably vague on details and only slight assistance from the auditor's recapitulation based inevitably on much extra-judicial and undisclosed information. Since they did not detail and prove it item by item, they are not free to criticize the Judge for having treated it in lump as they did. With all of this complexity, this is the classic case for an acceptance of the Trial Court's findings. C. J. Dick Towing Co. v. The Leo, 5 Cir., 202 F.2d 850, 854; Cf. McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6.

■ We accept his basic premise but we differ in some applications. In his calculations he left in one substantial item which was patently not allowable in preservation of the *res*—the wages of the crew and "Captain" Bartlett as Master of the vessel. On the theory that all of this for sixteen months contemplated eventual foreclosure of the mortgage, there can be no basis for concluding that a vessel in such "lay up" needed such a crew to preserve the security. We delete this entirely.[3] We approach the balance of the expenditures by the Mortgagee in possession somewhat differently, al-

---

2. 46 U.S.C. § 973, 46 U.S.C.A. § 973, referring to persons specified in § 972, provides: " * * * but nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, *or for any other reason*, the person ordering the repairs * * * was without authority to bind the vessel therefor." (Emphasis ours.)

His status is comparable here to a charterer pro hac vice who can acquire no maritime lien in his own behalf, Frontera Fruit Co. v. Dowling, 5 Cir., 91 F.2d 293, 296; Odysseus III, D.C.S.D.Fla., 77 F.Supp. 297, 299, 1948 AMC 608, 611; The Fort Gaines, D.C.Md., 24 F.2d 438, 1928 AMC 459.

3. See record pp. 29–35:

| | B.H.Dollars | U.S.Dollars | |
|---|---|---|---|
| Total charges | | | $21,246.02 |
| Less: | | | |
| Crew salary | $4,650.00 | | |
| Bartlett | 2,750.00 | | |
| Bartlett | | $5,180.00 | |
| | | 3,626.80 | |
| | | | 8,806.80 |
| | | | $12,439.22 |

though the result is substantially the same as reached by the Trial Court. We think the record will specifically support only a limited allowance at Belize,[4] but once improper wages are deleted, those incurred at Carmen and Frontera ought to be taken into account in striking the balance.[5]

■■ Likewise, we accept the conclusion that a Mortgagee in possession must compensate the owner for use of the vessel. 14 C.J.S., Chattel Mortgages, § 187 a, p. 796; 59 C.J.S., Mortgages, § 318, p. 429. But we think the Trial Court stopped too quickly. When one claims possession in that capacity for an extensive period of time and does not avail himself of the existing contractual right to a private foreclosure, he cannot continue to hold the vessel indefinitely awaiting the day of an admiralty foreclosure with its obvious advantages without compensation. The Mortgagee must determine what he is going to do: a private foreclosure after which the vessel owner's rights cease or an Admiralty Preferred Ship Mortgage foreclosure in which, until seizure, (cf. 46 U.S.C.A. § 952 authorizing receiver) the owner is entitled to the compensation due an owner. Consequently, we think that for all but two of the sixteen months the owner is due a credit for the value of the vessel while held but not foreclosed either privately or by legal proceedings. On this record the two months for which no allowance is required was more than ample for the Mortgagee to have determined and executed his course of action.

■ A faint complaint is made that the Trial Court erred in disallowing the claims of Holopitza and Arnold, former master and chief engineer of the Challenger, (also stockholders and officers of the owner corporation) based on *in personam* admiralty decrees obtained by them for unpaid wages in the United States District Court, Southern District of Florida. Neither of them appealed and Challenger, Inc., the judgment debtor, owing them these wages, cannot do it for them. That decree is therefore final.

Accordingly the decree is modified,[6] with interest on the reduced amount, Appellant to recover costs of the appeal; otherwise affirmed.

Modified and affirmed.

4. Bartlett agreed that with slight repairs to the hull and some maintenance, spare parts to the engine, the vessel was seaworthy for a trip from Belize to the United States. Taking his estimates and all others, including those of the expert, Captain Dierlam, a marine surveyor, the record fixes this at a maximum of $2100.00.

| 5. Allowed at Belize | | $ 2,100.00 |
|---|---|---|
| Carmen, Frontera | $11,878.38 | |
| Less: Bartlett's wages, expense | 3,626.80 | |
| | | 8,251.58 |
| Total allowed | | $10,351.58 |

| 6. (a) Mortgage debt and interest to May 1, 1954 | $ 5,708.70 | |
|---|---|---|
| (b) Attorney's fees | 370.87 | |
| (c) Adjusted repairs, etc. | 10,351.58 | |
| | | $16,431.15 |
| Less: | | |
| (d) 4 months use (lobster tail) @ $500.00 | $ 2,000.00 | |
| (e) 10 months use @ $500.00 | 5,000.00 | |
| | | 7,000.00 |
| | | $ 9,431.15 |

Interest 6% on items (a) (b) from May 1, 1954, and from date on balance $3,351.58.