722 F.2d 126
 1985 A.M.C. 1908
 INTERNATIONAL MARINE TOWING, INC., Plaintiff-Appellant,
v.
SOUTHERN LEASING PARTNERS, LTD., etc., et al., Defendants-Appellees.
FIRST MISSISSIPPI NATIONAL BANK, Plaintiff-Appellee,
v.
INTERNATIONAL MARINE TOWING, INC., Intervenor-Plaintiff-Appellant,
v.
M/V KING'S CHALLENGER, her engines, tackle, apparel, etc.,
in rem, Defendant-Appellee.
 No. 82-3348.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 22, 1983.
 
 Phelps, Dunbar, Marks, Claverie & Sims, James H. Roussel, New Orleans, La., for plaintiff-appellant.
 Lemle, Kelleher, Kohlmeyer & Matthews, W.E. Noel, New Orleans, La., for First Miss. Nat. Bank.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before GARZA, RANDALL and GARWOOD, Circuit Judges.
 RANDALL, Circuit Judge:
 
 
 1
 This appeal involves the breach of a bareboat charter party. The issue presented for our determination is whether a maritime lien arises in favor of the charterer for the owner's breach of the charter party. Appellant International Marine Towing, Inc. ("IMT") contends that the district court erred in holding that IMT could not acquire a lien on the M/V KING'S CHALLENGER for breach of a charter party as a matter of law and as a result of a "prohibition of liens" clause in the charter party. IMT also alleges that the district court erroneously allowed appellee First Mississippi National Bank ("FMNB") to interpose an objection to a settlement entered into between IMT and Southern Leasing Partners, Ltd. ("Southern Leasing").
 
 
 2
 For the reasons stated below, we find that the district court properly allowed FMNB to object to the settlement between IMT and Southern Leasing. The district court erred, however, in holding that IMT was not entitled to a lien for damages suffered as a result of Southern Leasing's breach of the charter party. Thus, we reverse and remand.
 
 
 3
 I. FACTUAL AND PROCEDURAL BACKGROUND.
 
 
 4
 This action originated in Jacksonville, Florida, where the tug M/V KING'S CHALLENGER was arrested in connection with the foreclosure of a preferred ship's mortgage by FMNB. The M/V KING'S CHALLENGER was owned by Southern Leasing, but, at the time of the arrest, the vessel was under a bareboat charter to IMT. Prior to the arrest, IMT had made substantial expenditures in outfitting and repairing the tug so as to make the vessel seaworthy and fit for its intended use. IMT had also engaged the M/V KING'S CHALLENGER in a number of profitable towing operations. Once the tug was seized, IMT intervened, by way of an in rem proceeding against the vessel, to assert a claim for damages caused by the breach of the bareboat charter party. Several other parties also intervened, and eventually all parties to the action except IMT agreed to settle the litigation. It was decided that the vessel would not be sold but would be released for operation in order to obtain funds to pay various claims. A cash bond was posted by FMNB to secure IMT's claim, and the vessel was released. Thereafter, a corporate surety bond was substituted for the cash bond with FMNB as principal and the Federal Insurance Company as surety.
 
 
 5
 In addition to its in rem action filed in Florida, IMT filed an in personam action against Southern Leasing in New Orleans, Louisiana. The in rem action was then transferred to New Orleans and consolidated with the in personam proceeding. Meanwhile, in Jacksonville, FMNB foreclosed on its preferred ship's mortgage, alleging that Southern Leasing had breached the settlement agreement. The vessel was seized a second time and was sold to satisfy FMNB's judgment against Southern Leasing.
 
 
 6
 IMT's consolidated action was scheduled for trial, but IMT and Southern Leasing reached a settlement agreement as to IMT's suit for breach of the bareboat charter by Southern Leasing. An order of dismissal was entered and a stipulation of fact and law[1] was filed by the two parties and approved by the district court. FMNB made a motion to recall approval of the stipulation of fact and law, and to cancel the $50,000 release bond it had posted before IMT's actions were consolidated. FMNB asserted that the stipulation was erroneous as a matter of law in that it gave IMT a lien on the vessel and therefore the bond as a bareboat charterer. FMNB also maintained that such a lien was contrary to the "prohibition of liens" clause in the charter party. The district court set aside the stipulation insofar as it recognized a lien on the M/V KING'S CHALLENGER in favor of IMT. IMT appeals, contending that FMNB had no standing to intervene in the suit, and that the district court erred in holding IMT could not acquire a lien for breach of the charter party.
 
 
 7
 II. INTERVENTION OF FMNB.
 
 
 8
 The threshold question presented by this appeal is whether FMNB had standing to challenge the settlement entered into by Southern Leasing and IMT.[2] Before addressing this issue, however, it is necessary for us to consider the effect of FMNB's failure to comply with the procedure for intervention established by Federal Rule of Civil Procedure 24(c).[3] Although some courts have held that it is reversible error to conduct any proceedings at the behest of parties who have failed to intervene formally pursuant to rule 24(c), see, e.g., Spangler v. Pasadena City Board of Education, 552 F.2d 1326 (9th Cir.1977), other courts have been willing to ignore technical flaws in the intervention process, see, e.g., Smartt v. Coca-Cola Bottling Corp., 337 F.2d 950 (6th Cir.1964), cert. denied, 380 U.S. 934, 85 S.Ct. 941, 13 L.Ed.2d 822 (1965), or have been willing to overlook a total failure to comply with Rule 24(c). See, e.g., SEC v. Lincoln Thrift Association, 577 F.2d 600 (9th Cir.1978); Roach v. Churchman, 457 F.2d 1101 (8th Cir.1972).
 
 
 9
 We have been lenient in hearing the appeals of parties who have failed to fulfill the provisions of Rule 24(c). See In re Beef Industry Antitrust Litigation, 589 F.2d 786, 789 (5th Cir.1979) (trial court implicitly authorized intervention of nonparties when it denied nonparties' motion to modify protective order so that party could comply with House of Representatives subpoena for documents); United States v. United Fruit Co., 410 F.2d 553 (5th Cir.), cert. denied, 396 U.S. 820, 90 S.Ct. 59, 24 L.Ed.2d 71 (1969) (nonparty allowed to appeal denial of motion for permission to inspect and copy reports sealed under protective order); Caswell v. Manhattan Fire & Marine Insurance Co., 399 F.2d 417 (5th Cir.1968) (nonparty allowed to appeal denial of motion to quash subpoena).
 
 
 10
 When FMNB first learned that IMT and Southern Leasing had settled their dispute, it asked that a conference be held in chambers. During this conference, the district court concluded that the case should be reopened for consideration of the bond. The court then directed FMNB to submit a brief on this issue, giving IMT ten days to respond. Record Vol. V at 1143. This could be construed as an invitation to FMNB to file its motion without first seeking formal intervention. See In re Beef Industry Antitrust Litigation, supra, at 789. Compare Roach v. Churchman, supra, at 1104 (affording relief to a participant without formally naming it as a party deemed "equivalent to authorizing" intervention). In view of our lenience in the past and the fact that the district court's act might be considered equivalent to authorizing intervention, we will not dismiss for failure to comply with Rule 24(c). Instead, we will assume that the district court implicitly allowed FMNB to intervene.[4] We stress, however, that FMNB should have filed a formal motion for intervention pursuant to Rule 24(c), and that future litigants should not rely upon this decision as a means to circumvent the clear requirements of the rule.
 
 
 11
 We now turn to IMT's assertion that FMNB lacked standing to interpose an objection to the stipulation filed with the district court. IMT contends that FMNB is a mere surety for any in rem judgment rendered against Southern Leasing for IMT and, as such, had no right to intervene. In support of its position, IMT cites several cases purportedly standing for the proposition that sureties on a stipulation for the release of a vessel have no right to defend the bond and thus may not intervene. The L.I.R.R. No. 18, 67 F.2d 290 (2d Cir.1933); The Cartona, 297 F. 827 (2d Cir.1924); The Lydia, 1 F.2d 18 (2d Cir.), cert. denied, 266 U.S. 616, 45 S.Ct. 97, 69 L.Ed. 470 (1924); Perriam v. Pacific Coast Co., 133 F. 140 (9th Cir.1904); The New York, 104 F. 561 (6th Cir.1900); The Glide, 72 F. 200 (4th Cir.1896). Most of these cases, however, do not support the position that a surety cannot appear; the cases instead stand for the proposition that the claimant of a vessel may appeal alone, without the participation of its surety. See, e.g., The L.I.R.R. No. 18, supra; The Lydia, supra; Perriam v. Pacific Coast Co., supra; The New York, supra; The Glide, supra. Moreover, these cases would be more apposite if the Federal Insurance Company, surety of the release bond posted by FMNB, had sought to intervene. Here, FMNB has a direct interest in the outcome of IMT's suit, as it posted the bond as principal and will bear the cost of an in rem judgment against Southern Leasing.[5]
 
 
 12
 Therefore, we hold that FMNB had sufficient standing to intervene in the action between IMT and Southern Leasing, and that FMNB is a party to the case.
 
 
 13
 III. MARITIME LIENS ARISING FROM BREACH OF THE CHARTER PARTY.
 
 
 14
 The term "charter party," often shortened to "charter," refers to the document setting forth the terms of a contract when one person (the "charterer") takes over the use of the whole ship belonging to another (the "owner"). G. Gilmore & C. Black, The Law of Admiralty Sec. 4-1, at 193 (2d ed. 1975). There are three generally recognized types of charter parties: the first two, the "voyage charter" and the "time charter," occur when the vessel is manned and navigated by the owner. In the voyage charter the ship is engaged to carry a full cargo on a single voyage, whereas in the time charter the charterer engages the ship to carry cargo over a fixed period of time. The third charter is known as a "bareboat" or "demise charter." In this arrangement, the charterer operates the ship and is regarded as the owner of the ship pro hac vice.[6] Id.
 
 
 15
 Cases that address the charterer's right to a maritime lien due to the owner's breach of the bareboat charter are sparse. Professors Gilmore & Black, in listing claims which give rise to maritime liens, include:
 
 
 16
 Charter-parties.... [L]iens arise for breach of charter-party in either direction. The charterer has a lien on the vessel for owner's breach; the owner may have a lien on cargo ... for charterer's breach (which is usually nonpayment of the charter-hire).
 
 
 17
 G. Gilmore & C. Black, supra, Sec. 9-20, at 631 (footnote omitted).[7]
 
 
 18
 The fact that the charter party between IMT and Southern Leasing is a bareboat charter does nothing to eliminate the essential maritime nature of the agreement, nor the legal consequences arising therefrom. Although the bareboat charterer might be characterized as the owner pro hac vice as to third parties, the charterer is still the charterer as to the vessel owner and is thus entitled to a maritime lien against the vessel for the owner's breach of the charter party. In The Oceano, 148 F. 131 (S.D.N.Y.1906), the court allowed the time charterer to proceed in rem against the vessel when the owner refused to refund excess advances made by the charterer. In Rainbow Line, Inc. v. M/V Tequila, 480 F.2d 1024 (1973), the ship owner prematurely withdrew the vessel from service and the charterer sought damages for breach of the time charter. The court held that the charterer had a maritime lien against the vessel for the breach of the charter, noting:
 
 
 19
 The American law is clear that there is a maritime lien for the breach of a charter party, and because the damages sought to be recovered by [the charterer] are all of a maritime nature and flow directly from the breach of the charter, it has a maritime lien.
 
 
 20
 The Supreme Court, in dicta, in The Schooner Freeman v. Buckingham, 59 U.S. [ (18 How.) ] 182, 190, 15 L.Ed. 341 (1955), stated that "charter parties, must, in the invariable regular course of ... business, be made, for the performance of which the law confers a lien on the vessel."
 
 480 F.2d at 1027 (footnotes omitted).[8]
 
 21
 Although Rainbow involved the breach of a time charter, we find the court's language applicable to bareboat charters as well: "Because the damages sought to be recovered by [the charterer] ... flow directly from the breach of the charter, it has a maritime lien." Id.
 
 
 22
 Persuasive authority exists for the proposition that a bareboat charterer can maintain a lien for the owner's breach, although these cases do not directly address this issue. In Petersen Towing Corp. v. Capt. Abrams, Inc., 388 F.Supp. 1166 (1975), the plaintiffs claimed to be maritime lienors when the owner breached a bareboat charter by prematurely removing the tug from service. The owner maintained that the charter party had never been executed, and that a maritime lien could not attach to this contract. The court, citing Rainbow Lines, Inc. v. M/V Tequila, supra, held that the vessel had been delivered to the charterer, and that the charter party was not executory. Thus, the court held that the plaintiffs were entitled to a maritime lien for breach of the charter.
 
 
 23
 Similarly, in Florida Yacht Brokers, Inc. v. Yacht Huckster, 249 F.Supp. 371 (S.D.Fla.1965), plaintiffs entered into a bareboat charter with the owner of a yacht. After execution of the charter, it was breached by the owner. The court held that the plaintiffs had a lien on the vessel for damages arising from the cancelled contract, as well as for the cost of work and materials furnished the vessel.
 
 
 24
 In the case before us, the district court concluded that four cases from this circuit prevent IMT from acquiring a lien for Southern Leasing's breach of the charter party: Frontera Fruit Co. v. Dowling, 91 F.2d 293 (5th Cir.1937); Challenger, Inc. v. Durno, 227 F.2d 918 (5th Cir.1955); Sasportes v. M/V Sol De Copacabana, 581 F.2d 1204 (5th Cir.1978); and Roberts v. Echternach, 302 F.2d 370 (5th Cir.1970). We find that none of these cases involves the breach of a bareboat charter by the owner and thus the cases are not controlling.
 
 
 25
 In Frontera Fruit Co. v. Dowling, supra, the charterer was in a joint venture with the owner of the boat, and the charterer sought to place a lien on the vessel for wages advanced to the ship's crew. We held a joint venturer cannot acquire a lien for advances since he is primarily liable for the vessel's indebtedness. Since IMT was not a joint venturer with Southern Leasing, this case is inapplicable.
 
 
 26
 Challenger v. Durno, supra, held that a mortgagee in possession of a vessel could not create a maritime lien in its favor by paying materialmen and ship repairers for work and services ordered by him and taking assignment of their rights. Durno involved the authority of a mortgagee to subject the vessel to liens by third parties and thus does not bear on the issue at hand. FMNB does, however, direct our attention to footnote 2 of the Durno opinion, which states that the mortgagee's status as one in control of the vessel "is comparable to a charterer pro hac vice who can acquire no maritime lien in his own behalf." 227 F.2d 921 n. 2 (citations omitted). However, this dictum referred to the charterer's right to acquire liens in its own behalf for advances to third parties, and none of the cases cited as authority for this dictum hold that a bareboat charter cannot hold a lien for breach of the charter party.[9]
 
 
 27
 Sasportes v. M/V Sol De Copacabana, supra, restates the rule that an owner, part owner, or joint venturer cannot hold a maritime lien. 581 F.2d at 1207. No joint venture was found in Sasportes and the plaintiff was allowed a maritime lien.
 
 
 28
 Finally, in Roberts v. Echternach, 302 F.2d 370 (5th Cir.1962), we held that third parties can acquire a lien for work done on a vessel at the owner's express request, despite the fact that the charter party contains a "prohibition of liens" clause. However, Roberts does not focus on maritime liens for claims brought on behalf of a bareboat charterer as a result of the owner's breach.[10]
 
 
 29
 In sum, we find none of the cases relied upon by the district court to be applicable to the case at hand, nor do they controvert the previously discussed authority giving rise to liens for breaches of bareboat charters. Therefore, we hold that IMT is not prevented from having a maritime lien on the M/V KING'S CHALLENGER as a matter of law.
 
 
 30
 The district court also found that the "prohibition of liens" clause contained in the charter party bars IMT's lien for Southern Leasing's breach of the charter. Section 7.3 of the charter party between IMT and Southern Leasing provides:
 
 
 31
 Neither the Charterer nor the Master of the Vessel shall have the right, power or authority to sell, assign, or transfer, or to create, incur or permit to be imposed upon the vessel any liens whatsoever except the crews' wages and salvage and inchoate operating expenses not discharged within sixty days from incurrance.... The Charterer agrees to notify any person furnishing repairs, supplies, towage or other necessities to the Vessel that neither the Charterer nor the Master has any right to create, incur or permit to be imposed upon the Vessel any liens whatsoever except crews' wages and salvage as set forth hereinabove.
 
 
 32
 This clause does not undertake to deal with the power of the owner to subject his vessel to maritime liens through his breach of the charter. "That clause, and the two sections of the Maritime Lien Act upon which it operates, has to do with the power of others--master, agent, charterer, etc.--to subject the vessel to liens for work done by third parties at the request of those presuming to speak for the ship." Roberts v. Echternach, 302 F.2d 370, 372-73 (5th Cir.1962) (footnote omitted). In fact, as Judge Brown noted with regard to the clause, "the circumstances in which the owner could restrict his own power [to subject the vessel to liens] are severely limited and one could safely say, never to permit the owner, as such, to obtain any advantage." Id. at 372.
 
 
 33
 We conclude that the clause does not speak to the issue of liens created by the owner's breach and does nothing to waive charterer's lien rights for damages caused by such a breach, especially considering our strong presumption against such a waiver. See Inland Credit Corp. v. M/T Bow Egret, 552 F.2d 1148, 1152 n. 4 (5th Cir.1977). By its very terms, the clause deals only with the right of the charterer to create liens in favor of third parties, and does not bar the creation of liens in favor of IMT as a result of a breach of the charter party by Southern Leasing.
 
 
 34
 IV. CONCLUSION.
 
 
 35
 In its brief, IMT requests that the judgment of the district court be reversed and that the case be remanded for judgment pursuant to the stipulation of fact and law entered into by IMT and Southern Leasing. Brief of IMT at 20. Because the district court erred in holding that IMT could not acquire a lien for breach of a bareboat charter party, we reverse. However, we decline to order that the portion of the judgment vacated by the district court be reinstated, preferring to leave the course of this litigation in the first instance to the district court.
 
 
 36
 REVERSED and REMANDED.
 
 
 
 [1]
 The conclusions of law state:
 CONCLUSIONS OF LAW
 I.
 A charter party is a maritime contract and any disputes which may arise in the interpretation of such a contract falls within the United States District Court's Admiralty Jurisdiction. Bunge Corporation v. The M/V FURNESS BRIDGE, 390 F.Supp. 603 (E.D.La.1974).
 II.
 The foreclosure of the mortgage on the M/V KING'S CHALLENGER resulted in the breach of the charter party entitling International Marine Towing, Inc. to a maritime lien for labor and materials furnished to the M/V KING'S CHALLENGER. Florida Yacht Brokers, Inc. v. The Yacht HUCKSTER, 249 F.Supp. 371 (S.D.Fla.1965).
 III.
 Due to Southern Leasing Partners, Ltd.'s disputes with The First Mississippi National Bank which pre-existed the commencement of the charter party agreement with International Marine Towing, Inc., it failed to provide a seaworthy vessel at the inception of the bareboat charter party agreement, and as a consequence, International Marine Towing, Inc. has a valid claim for financial unseaworthiness against the M/V KING'S CHALLENGER, in rem. Works v. Leather, 97 U.S. 379, 24 L.Ed. 1012 (1878). Since there were (sic) no unequivocal waiver of this requirement in the charter party agreement, this is a valid claim. Jordan v. Mayronne Drilling, Mud, Chemical, and Engineering Service, 214 F.2d 410 (5th Cir.1954).
 IV.
 The amount of damages sustained by International Marine Towing, Inc. is TWO HUNDRED FIFTY THOUSAND AND NO/100 ($250,000.00) DOLLARS.
 V.
 Accordingly, International Marine Towing, Inc. is entitled to judgment against Southern Leasing Partners, Ltd., as claimant of the M/V KING'S CHALLENGER only, and against the M/V KING'S CHALLENGER, or any bond posted in lieu thereof, in rem, in the amount of TWO HUNDRED FIFTY THOUSAND AND NO/100 ($250,000.00) DOLLARS.
 
 
 [2]
 In its brief, FMNB contends that the issue of FMNB's standing was not raised by IMT before the district court, and therefore cannot be raised on appeal. After reviewing the record we find the contrary; the issue of FMNB's standing was clearly raised in IMT's motion in opposition to cancel the bond
 
 
 [3]
 The original briefs of the parties did not discuss this issue; however, we found it sufficiently important to raise sua sponte, see In re Beef Industry Antitrust Litigation, 589 F.2d 786, 788 n. 2 (5th Cir.1979), and ask for supplemental briefing on this question by the parties
 
 
 [4]
 In its supplemental brief, see note 3, supra, IMT raises certain objections to FMNB's intervention, such as timeliness, which were not raised in the district court below. Thus, we will not consider them on appeal
 
 
 [5]
 Neither FMNB nor IMT cited any cases either granting or denying the principal on a release bond the right to defend the bond (replacing the vessel) in pending litigation. The lack of authority on this issue is not surprising--usually the claimant of a seized vessel is also the principal on the bond
 
 
 [6]
 "For this turn; for this one particular occasion." Black's Law Dictionary 1091 (rev. 5th ed. 1979)
 
 
 [7]
 Although the cases cited as authority involve nonbareboat charters, the authors do not limit liens for breach to time and voyage charters. Discussion in other treatises on maritime liens arising from breach of bareboat charters are equally oblique. See 2 Benedict on Admiralty 3-54, Sec. 43 (1981). The dearth of authority on this issue is noted by Hervey Allen in Liens: Liabilities Arising from Delay or Failure in Performance, 49 Tul.L.Rev. 970 (1975), where he observes "there is a dearth of case law on liens under a demise charter." Id. at 971 n. 6
 
 
 [8]
 We note, as did the court in Rainbow, that there is no lien for breach if the charter party is an executory contract. Id. at 1027 n. 6. In the present case, the vessel had been delivered before its seizure to IMT and IMT had used the boat for a number of towing operations. Delivery of the vessel commences the performance of a time charter and removes it from executory status. Id. Delivery of the vessel to the charterer and its use by the same also commences the performance of a bareboat charter as so to remove its executory status
 
 
 [9]
 We also note that in the first two cases cited, Frontera Fruit Co. v. Dowling, 91 F.2d 293 (5th Cir.1937), and Odysseus III, 77 F.Supp. 297 (S.D.Fla.1948), the owners pro hac vice had an interest in the vessel greater than that of a bareboat charterer. Frontera Fruit, distinguished supra, involved a joint venturer, and Odysseus III involved a part-owner seeking a lien against the vessel for advances. The other case cited, The Fort Gaines, 24 F.2d 438 (D.Md.1928), did not involve an owner who was pro hac vice. Thus, none of these cases deal with the breach of a bareboat charter party by the owner
 
 
 [10]
 In dicta, Roberts remarked that, as a general proposition, a bareboat charterer does not have authority to acquire a lien in his own behalf. The two cases cited for this proposition, however, do not hold that a bareboat charter, as such, cannot have such a lien. Rubin Iron Works, 100 F.2d 871 (5th Cir.1938), denied a maritime lien for wages to the agent of a purchaser of a vessel. Challenger v. Durno, 227 F.2d 918 (5th Cir.1955), has already been distinguished, supra