RYAN MARINE SYSTEMS, INC.

v.

YACHT "TULIP II", et al.

v.

FIRST NATIONAL BANK OF BOSTON.

FIRST NATIONAL BANK OF BOSTON

v.

YACHT "TULIP II".

Nos. 80–6073–CIV–NCR,
80–6246–CIV–NCR.

United States District Court,
S.D. Florida,
Fort Lauderdale Division.

July 17, 1987.

Edward R. Fink, Fort Lauderdale, Fla., for Ryan Marine Systems and Van Dusen, Inc.

Thomas D. Lardin, Weaver, Weaver & Lardin, Fort Lauderdale, Fla., for claimant-owner.

Frank J. Marston, Fowler, White, Burnett, Hurley, Banick & Strickroot, PA, Miami, Fla., for First Nat. Bank of Boston.

Henry H. Bolz, III, Smathers & Thompson, Miami, Fla., for Merrill Stevens Dry Dock Co.

ROETTGER, District Judge.

This maritime matter represents a typical case arising out of the Fort Lauderdale division because it involves a luxury yacht. However, the factual background is unique almost to the point of being a farce on the high seas, even to some of the names. If one had to choose a title, perhaps Abbott and Costello at Sea. Laurel and Hardy would have rejected the script.

### THE CAST (AND CASE STATUS)

Bickel, of Tulip Yachts, Ltd., bought a luxury yacht, defendant herein, a 79 feet, 20-year-old Feadship (hull number 9) named TULIP II, for the purposes of chartering it in the Virgin Islands during the winter season with the usual hope of making a profit. Alas, not atypically, Mr. Bickel had never owned a boat before.

Intervening plaintiff, First National Bank of Boston, held a preferred ship's mortgage on TULIP II and has already foreclosed its mortgage; the sale has been held by order of this court. The principal mortgage lien and accrued interest on the sale amount to $153,083.13 (uncontested amount and already distributed to the Bank); the proceeds of the sale were $231,000.00, leaving a surplus of nearly $78,000.00 which has been paid into the Registry of the Court. That surplus is the target of the parties in the suit.

First National Bank of Boston claims a total of $73,874.22, plus interest, for care and safekeeping of the vessel and transportation of the vessel back from the Virgin

Islands to Fort Lauderdale for purposes of sale. The other parties hotly contest the reasonableness of First National Bank of Boston's claim for expenses, not surprisingly. The original plaintiff was Ryan Marine Systems, Inc. seeking recovery of $13,-642.45 for repair and services of TULIP II prior to its going to the Virgin Islands in 1979. Merrill Stevens Boat Yard installed stabilizers for the boat and claim the amount of $3,614.40, the unpaid balance of the original claim. Ryan Marine had planned to have the stabilizer work done at a local yard but the owner wanted it done at Merrill Stevens in Miami and moved it there for work. The only issue about the balance of Merrill Stevens' claim is whether it should be borne by the owner, who has paid the remainder of Merrill Stevens' claim, or by Ryan Marine; if the latter, is Ryan entitled to recover this from the proceeds, if Ryan has sufficient priority for its claim before the proceeds are exhausted?

The captain, who was aboard the boat for only a one month's period in 1979 when TULIP II was at Guadalupe and Tortola in the British Virgins, represents himself and seeks recovery of allegedly unpaid wages of $1,800.00 for the one month, plus travel expenses of $679.00.

The owner placed a second mortgage on the vessel without permission of the first mortgagee and in contravention of the terms of the mortgage. That second mortgage was held by Wingding, Inc. which apparently concluded there'd never be enough left out of the proceeds for them and has waived any claim. Of course, the owner contests the claim of the First National Bank of Boston and seeks the balance after claims with priority.

## ACT I: THE VOYAGE SOUTH

The vessel left Fort Lauderdale for the American Virgins in March of 1979 under the command of Capt. Brennan. Unfortunately, he ran aground near San Salvador and the owners suddenly received a phone call—predictably, on a Saturday morning—demanding $2,400 in cash from a boat own-

er in San Salvador who had taken the TULIP II in tow and was claiming a salvor's lien. After the salvors were satisfied, the captain continued on with his boat to Guadalupe and was subsequently discharged. It's not clear from the evidence whether his discharge had anything to do with the fact he also managed to run aground near Guadalupe. That grounding resulted in drawing mud and sand into the intakes thereby precluding the flushing of one of the passenger heads, among other problems.

Capt. Breau [1] was then hired by Mr. Bickel as the captain of the vessel; he served in that capacity from 16 February to 16 March in 1979 at a salary of $1,800 a month to be paid semi-monthly. Owner Bickel testified he paid Capt. Breau the $1,800 which Capt. Breau flatly denied. From all the evidence, the court finds Capt. Breau was paid for the first half of the month because—together with other evidence—it doesn't seem consistent with his personality for him to stay otherwise. However, in mid-March there was a stormy session between Capt. Breau and Bickel's son-in-law, Mr. Douglas, who was Bickel's on-board representative. Just observing the two men as they testified made the fact of their stormy dispute not at all surprising to the court. The court finds that Capt. Breau was not paid for the second half of his month of service.

Following the stormy session and his discharge or termination, Capt. Breau embarked on a rather unusual course of conduct. He immediately flew to Ft. Lauderdale to plead his case with Mr. Bickel, the yacht owner. He felt he received a brush-off from Bickel so he managed to meet Mr. Johnson of Wingding, the second mortgagee, and ended up acting as the agent of Wingding in locating the vessel and filing suit, first trying to do so in the American Virgins and then in the British Virgins. In addition, he called the Iranian Embassy to warn the Shah's brother-in-law, who had arranged a future charter aboard the yacht, that the generator had been inoperative for 3 days because of the sand intake.

---

1. His former vessel for several years was Prosit; Tulip II's previous name was Esprit. The Court finds it unnecessary to express further observations about what's in a name.

Capt. Breau's ostensible purpose in warning the Iranian authorities was to avoid any potential personal liability from food spoilage because of the generator's not being operative during the time while he was captain of the vessel.[2]

The court further finds that Capt. Breau's return to Ft. Lauderdale is also compensable in the amount of $679, for a total of $1,579.

## ACT II: THE TORTOLAN CAPER

From Guadalupe the boat went to Tortola where suit was filed about April 5, 1979 by Wingding, but not against the bank, in the British Admiralty court in Tortola, British Virgin Islands. The boat was arrested despite questionable jurisdiction.

At the time of the suit by Wingding, Bickel's mortgage to the bank was current and in good standing—other than the fact he had executed a mortgage to Wingding without permission of the bank. At the time of the boat's arrest in Tortola, there were two charters for two weeks' duration at $15,000 per charter which revenue would have accrued to defendant TULIP YACHTS (and Bickel). Both charters were naturally cancelled after the arrest.

At each stage of the Tortolan proceedings, the bank attempted to intervene; the judge finally permitted it at the final hearing just before he dismissed the case. Although the record is not completely clear, it appears from the evidence that the fact that Bickel and Wingding had a suit pending over their differences in a New York State Court, plus willingness on the part of Bickel and the bank to agree to a settlement, were among the reasons the judge permitted the intervention at that stage by the bank and these factors resulted in the dismissal of the Tortolan matter. What effect the jurisdiction question had on the disposition is not entirely clear.

The proceedings in Tortola did not proceed expeditiously because of the judge's calendar, as well as a rather dramatic natural phenomenon. For example, the proceedings in April were continued because a volcano erupted on St. Vincent's Island and the judge had a family on the island and returned to St. Vincent's. It was not resumed until June. The situation created allies of the owner (basically Bickel) and the Bank, who were collaborating in an effort to defeat Wingding's claim and to get the boat out of the British Virgins. Apparently, this was necessary to the point that the judge, uncharacteristically for a British judge, became involved in the attempted settlement negotiations.

Bickel and Marshall, of Yegen—the Bank's agent, had negotiated the dismissal of the matter to terminate the case in the British Virgins and the vessel was released to Marshall in the British Virgins with Bickel's consent. In fact, Bickel's captain, Damian, went on Yegen's payroll, as Marshall had suggested and he did so a day or so before the boat was released. The evidence is convincing that there is a better powerboat market in Fort Lauderdale[3] than in the Virgin Islands, and very few powerboats stay in the Virgin Islands area after April.

Bickel and Marshall had dinner in the Virgin Islands on the night (June 15th) before they both returned to the States. At that dinner, the earlier Tortola understandings were firmed up, that the boat would be "tidied", moved to Fort Lauderdale, and put on the market to see which happened first: either Bickel's refinancing of the first mortgage or a sale. Bickel even had a charter party, who was interested in returning the boat from the Virgin Islands to Fort Lauderdale. (Bickel is clear in his recollection of this agreement and Marshall cannot recall one way or another.)

2. The Court is not unmindful of the fact that normally someone does not get that upset about anything unless there was a rather strong stimulus and $900 plus a dispute may not add up to that kind of a stimulus. However, from all the evidence, the Court is convinced that Capt. Breau was paid for the first half of the month but not for the second half of the employment.

3. The Court has heard evidence in several other cases as well that Fort Lauderdale's powerboat market, and the sailing vessel market, as well, is the strongest in America, except for perhaps Newport Beach, California, on the Pacific Coast; consequently, this evidence is quite credible.

However, the Bank wouldn't give its approval even though the charter would have paid all costs of fuel and food other than the crew's salary. The court specifically finds Bickel consented to the release to Marshall (acting for the Bank) in Tortola on the basis of Marshall's representation about promptly bringing the boat back to Fort Lauderdale to be placed on the market.

During the summer of '79 Bickell attempted to get an answer from Yegen about what was happening with the boat with the response being "that [Yegen] hadn't yet decided what they were going to do with it." His pressing for an answer from Yegen was fruitless. Discussions kept occurring in intervals of a week to 10 days between the time the vessel was brought to St. Thomas in June and its arrest by the bank in St. Thomas in September.

Natural forces continued to plague the vessel because Hurricane David struck the Virgin Islands in late August. By the time of the termination of the Tortolan proceedings in early June, Bickel was not current in payments on the first mortgage.

While the boat was in St. Thomas, many items were, predictably, stolen from the boat and it deteriorated somewhat rapidly. Bickel testified the boat was in fairly decent shape when he last saw it in the Virgin Islands in June but not in Fort Lauderdale when it returned in early 1980. His description of the relative condition in the two places is quantified as follows: on a scale of 1 to 10, it was a 9 in St. Thomas and in Fort Lauderdale, it was a 4.

Bickel sent a potential buyer to St. Thomas to look at the boat after it had been moved to the American Virgins. Other buyers shied away because of the expense of going to St. Thomas to take a look at only one boat. Various yacht brokers made inquiries on behalf of potential purchasers, but the inquiries foundered on whether Bickel would advance the costs for a buyer to go to the Virgin Islands to look at the boat.

Bickel felt that the attitude of the Bank was "too bad, Mr. Bickel, your boat's down there. That's tough. Under the terms of the mortgage you pay all the costs." That, of course, is the position of the Bank in the instant suit.

ACT III: THE U.S. VIRGIN ISLANDS
PROCEEDINGS AND RETURN TO
FORT LAUDERDALE

In any event, TULIP II departed Tortola and the British Virgins on June 13, 1979. It was taken by the Bank, essentially as a creditor-in-possession, to St. Thomas in the American Virgin Islands and there incurred a dockage bill at the Sheraton Hotel for the months of June, July, August and early September. Suit was finally instituted by the Bank in the U.S. District Court in the American Virgins on September 8, 1979. A default judgment was entered in that suit against the owner of the vessel. The Defendants were the vessel, Tulip Yachts, Limited, the technical owner, and Wingding, Inc., the second mortgagee. A default judgment was entered on November 15, 1979 in the sum of $150,083.13, plus interest in the sum of $7,996.08, $29,145.50 for care, custody and preservation of collateral, $4,287.50 for attorneys' fees which also included $1,000.00 for the British lawyer's fee in Tortola, and $752.69 for costs.

Bickel, the owner, and the Bank stipulated that the vessel be transported to Fajardo, Puerto Rico "to be hauled and surveyed to determine what repairs were necessary to make the vessel seaworthy." That stipulation was followed 13 days later on December 4, 1979 with a stipulation that Fajardo Marina was unable to handle the work and no facilities in the Virgin Islands were adequate to handle the necessary survey and repairs and the vessel was to be transported to San Juan, Puerto Rico for similar work.

The boat was never hauled in Puerto Rico. However, Mr. Campbell, a Fort Lauderdale surveyor, performed a survey in San Juan that the vessel was "seaworthy to make the voyage from San Juan, Puerto Rico to Florida with a reasonable degree of certainty." (PX 13)

By a separate exhibit, (PX 14) dated the same day, Mr. Campbell reported that the boat was run-down and essentially ascribed to the boat's "lying idle for some time". The court further observes that the boat was deemed seaworthy and made passage from San Juan, Puerto Rico to Fort Lauderdale in January of 1980. It also was seaworthy, despite the sand in the intake, when it was in Guadalupe in 1979. The Court must conclude that most of the deterioration involved was attributed to delay and that delay is unquestionably attributable to Plaintiff/Intervening Plaintiff, First National Bank Of Boston.

Certain repairs necessary for passage to Florida were made in San Juan, namely to the generator and governor, and the transportation expenses, including the cost of the crew for the passage back totalled $4,150.00. The passage took a little longer because it was prudent to take a coastal route rather than a completely open water passage.

The boat returned to Florida in January, 1980 with its name on the transom deliberately concealed by the Bank's agent, Yegen. Suit was instituted in this district by RYAN MARINE on February 7, 1980 and FIRST BANK OF BOSTON intervened shortly thereafter. Subsequently, FIRST BANK OF BOSTON filed its own suit in this district on the Virgin Islands judgment, which cases were consolidated. The Virgin Islands case was transferred upon motion of the Bank and pursuant to Judge Christian's order dated April 15, 1980.

### FINDINGS OF FACT

The matters stated above in this order are made as the court's finding unless expressly otherwise indicated.

### FURTHER FINDINGS

The court finds strongly that the conduct of the Bank in this matter has been, at best, cavalier; additionally, the court's findings against the Bank that the charges after the boat was returned to St. Thomas —other than the reasonable costs of returning the vessel to Fort Lauderdale [4] for court proceedings and sale, as was eventually done—result from many items of evidence. The court won't attempt to recount them all, but a few of them that come readily to mind are: (a) the fact that seas are generally calmer in summer than in winter and one does not want to try to make the voyage during the height of the hurricane season; (b) the vessel sat in St. Thomas for almost three full months during the summer before suit was instituted in St. Thomas, only to be reinstituted in Fort Lauderdale when the boat was finally brought back to Fort Lauderdale in January of 1980: (c) the seemingly endless cavalcade of "experts" sent by Yegen, the Bank's agent, to tend to these various matters. Among the more questionable expenses are the following: the trip on April 6, 1979 by Marshall to Tortola to sign an affidavit. He admitted the affidavit could have been mailed. (2) sending a sailboat expert, Demarest, at an expense of $630.00, to fly to Tortola to inspect a Feadship, a power boat. (3) Campbell's survey was that it was okay to take the boat from the Virgin Islands to Fort Lauderdale, yet Toma was flown over from Puerto Rico to the Virgin Islands to see about hauling the boat in Fajardo. Of course, the marine railway broke in Fajardo so the boat went to San Juan, instead. In San Juan, after a period of time the boat was never hauled and the boat made the trip to Fort Lauderdale anyway. (4) Turner made three trips to St. Thomas within a period of 10 days. One an overnight trip and then four days later he returned and then returned immediately again. In addition, Turner hired a rescue boat to trail along behind on the voyage from the Virgin Islands to Puerto Rico in case the boat sank because they had not been able to haul the boat in the

---

**4.** It is interesting to note that in December of 1979, Yegen wanted to charter out the boat to someone to bring it back to Fort Lauderdale; of course, they couldn't do that then because it was in the custody of the U.S. Marshal of the U.S. District Court in the Virgin Islands. However, they could have done it in June when they were the mortgagee in possession and Bickel already had the charter party lined up. With these facts in evidence, this Court has some difficulty in awarding costs of returning the boat from St. Thomas to Fort Lauderdale to the Bank.

Virgin Islands. As noted above, the boat wasn't hauled in Puerto Rico either and it did make the trip safely to Fort Lauderdale as Campbell said it would. A trailing rescue boat and nearly all, if not all, of these expenses were completely unnecessary—at least, they would have been, if the boat had been returned by the Bank to Fort Lauderdale in June, as the Bank should have done.

These are just some of the items that convince the court that the Bank's attitude was that the vessel was worth considerably more than the amount of the Bank's lien —a correct conclusion of the Bank—and, therefore, there was really no rush. Thereafter, the boat was not brought back to Fort Lauderdale in a prudent manner in June, but instead, delays, duplication of expense, etc., were made ad nauseum because the money was going to come out of someone else's pocket. At least, that was the attitude of the Bank, first as mortgagee-in-possession and then for several months thereafter.

### CONCLUSIONS OF LAW

Citations are unnecessary for the claims of Ryan, Merrill Stevens and Capt. Breau.

 As to the duty owed by the Bank to the vessel and, correspondingly, to the vessel's owner, it is clear that a mortgagee in possession must compensate the owner for use of the vessel. *Challenger, Inc. v. Durno*, 227 F.2d 918 (5th Cir.1955).

The *Challenger* case provides an even stronger illustration of the legal indefensibility of the Bank's conduct because in *Challenger*, the vessel was lying in port "virtually abandoned" and "of practically no value"; the vessel had been unattended for some length of time when the mortgagee took possession of it. Judge Brown observed that "... two months ... was more than ample for the mortgagee to have determined and executed its course of action."

The three month delay in the instant case is absolutely inexcusable because the vessel was ready to make the return trip to the obvious boat market (Fort Lauderdale) in June. Instead, it was held for three months prior to instituting foreclosure in admiralty and the vessel suffered much depreciation, pilferage and unnecessary exposure to a hurricane purely as a result of the unconscionable delay. The court emphasizes it's not merely three months vice two months: it is any period of delay past a reasonably short period (probably two or three weeks) because this vessel, unlike the vessel in *Challenger*, was seaworthy and ready to go.

Order for costs and distributions to be made accordingly.