RAINBOW LINE, INC., Plaintiff-Appellee,

v.

M/V TEQUILA (ex Linglee), her engines, tackle, boiler, equipment, etc. et al. Defendants,

Empire Commercial Corporation, Claimant-Appellant.

No. 581, Docket 72-2204.

United States Court of Appeals, Second Circuit.

Argued April 4, 1973.

Decided June 18, 1973.

Michael Marks Cohen, New York City (Burlingham, Underwood & Lord and John G. Ingram, New York City, on the brief), for claimant-appellant.

Francis H. McNamara, New York City (Cichanowicz & Callan, New York City, on the brief), for plaintiff-appellee.

Before KAUFMAN, Chief Judge, and ANDERSON and OAKES, Circuit Judges.

ROBERT P. ANDERSON, Circuit Judge:

There are three principal issues in this case: what choice of law prevails, whether a breach of charter party gave rise to a maritime lien, and the priority of the lien.

The facts are these. Pursuant to a standard New York Produce Exchange time charter, the vessel LINGLEE, owned by the Simpson Steamship & Navigation Co. (Simpson), was delivered to her charterers, Rainbow Line, Inc. [Rainbow], on December 12, 1969 for a term of six months with options to renew for two additional periods of six months. Rainbow exercised the first of these op-tions. On October 28, 1970, Simpson prematurely withdrew the vessel from service and Rainbow sought damages for this breach of the charter party. On May 13, 1971, an arbitration panel awarded Rainbow $17,849.12.

In the meantime, on March 8, 1971, Simpson, a subsidiary of Windjammer International [Windjammer], sold the LINGLEE to another Windjammer subsidiary, Tequila, Ltd., which renamed the vessel the TEQUILA. As part of this transaction, Empire Commercial Corp. [Empire] loaned Tequila, Ltd., $180,000 on its note secured by a first preferred mortgage on the vessel. Within two months, however, Tequila defaulted on its payments.

In May of 1971 the TEQUILA was arrested in New York upon the complaint of Lewis Nadle who claimed $60,000 for salvage and towage services furnished the vessel when she ran aground off Honduras in November, 1970. Rainbow and Empire and nine other claimants also arrested the ship for claims totaling $392,312.40. The vessel was sold by the United States Marshal for $162,000.

Most of these claims have been settled out of the proceeds of the sale, and the fund now totals $84,271.81, with just three claims left pending against it— Rainbow's for $17,217.65;[1] Nadle's for $60,000; and Empire's for $230,814.47.

This appeal, authorized by 28 U.S.C. § 1292(a)(3), is taken from the order of the district court, which, on the basis of United States admiralty law, held that Rainbow had a maritime lien for the breach of the charter party. If this ruling is correct, Rainbow, under the Ship Mortgage Act of 1920, 46 U.S.C. § 953,[2] would have priority status over Empire and could receive immediate payment of its claim,[3] because Rainbow's

---

1. The court below entered judgment on the arbitration award in Rainbow's favor for $17,217.65 and this confirmation is not disputed on appeal.

2. There is no question that 46 U.S.C. § 953 applies to this foreclosure in a United States court, even though the mortgage was recorded in Liberia, Payne v. S.S. Tropic Breeze, 423 F.2d 236, 238–239

(1 Cir.), cert. denied, Samadjopoulos v. Nat. West. Life Ins. Co., 400 U.S. 964, 91 S.Ct. 363, 27 L.Ed.2d 383 (1970); G. Gilmore & C. Black, The Law of Admiralty, § 9–51, at 578 (1957).

3. Even if Nadle takes priority over Rainbow, there is enough in the fund to pay both in full.

lien attached before Empire recorded its mortgage; however, if Rainbow has no preferred maritime lien, there will be nothing left in the fund for its claim after Empire is paid.

█ The first issue is what law to apply. Empire contends that British law, which grants no lien for the breach of a charter party, must govern as it was the law of the flag at the time of the breach. Rainbow argues that the court below was correct in applying United States law because it was so intended by the parties to the charter. But maritime liens arise separately and independently from the agreement of the parties, and rights of third persons cannot be affected by the intent of the parties to the contract,[4] The Bird of Paradise, 72 U.S. 545, 555, 18 L.Ed. 662 (1866); see also, Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 10, 41 S.Ct. 1, 65 L.Ed. 97 (1920); G. Gilmore & C. Black, The Law of Admiralty, § 9–1, at 481–2 (1957).

This does not mean, however, that there is automatic recourse to the law of the flag. In Lauritzen v. Larsen, 345 U.S. 571, 582, 73 S.Ct. 921, 928, 97 L.Ed. 1254 (1953), the Supreme Court stated that maritime law resolves conflicts by "ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved." The Court went on in that Jones Act case to put specific importance on three factors: the law of the flag, the allegiance or domicile of the injured seaman, and the allegiance of the shipowner; it gave relatively little weight to the place of the tort, the place of the signing of the employment contract, the accessibility of a foreign forum, or the law of the forum, see Tjonaman v. A/S Glittre, 340 F.2d 290, 291 (2 Cir.) cert. denied 381 U.S. 925, 85 S.Ct. 1561, 14 L.Ed.2d 684 (1965). In

Romero v. International Terminal Operating Co., 358 U.S. 354, 382, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959), the Court held that the broad principles set forth in *Lauritzen* were to govern choice of law problems in all maritime cases but "due regard must be had for the differing interests advanced by varied aspects of maritime law." Thus, "[t]he controlling considerations are the interacting interests of the United States and of foreign countries, . . ." *Romero, supra,* 358 U.S. at 382–383, 79 S.Ct. at 485–486.

In applying the principles of *Lauritzen* to this case, it must be borne in mind that the present case was decided on its own facts and the legal problems contained in them, and that no one test can be stated for all maritime lien cases,[5] *cf.* Reese Depéçage: A Common Phenomenon in the Choice of Law, 73 Colum.L. Rev. 58 (1973). The present case involves a number of different considerations or potential points of contact between different nations; but because the court below proceeded on a different theory, it made no findings of fact on a number of the issues involved. The record, however, is sufficiently clear on the key points to make a remand unnecessary.

First, there is the registration of the vessel or the law of the flag. At the time of the breach, this was Bahamian or British; at the time of the mortgage and thereafter, it was Liberian. The owners were Simpson, Bahamian, and Tequila, Ltd., Liberian, but both of these corporations were subsidiaries of Windjammer, a United States corporation, having its principal place of business in Florida. Furthermore, Windjammer's president, Michael Burke, who also appears to have a controlling interest in Windjammer, is a Florida resident. As to the parties on this appeal, Rainbow is a Liberian corporation which conducts

---

4. Of course, the parties may agree between themselves that in the event of a breach, no such lien will arise, but this cannot adversely affect the rights of third persons.

5. For example, there is authority for the proposition that a lien for supplies furnished the vessel should be determined by the law of the place of the transaction, see The Scotia, 35 F. 907, 909 (S.D.N.Y. 1888).

all its business through an agent in Puerto Rico; and Empire is a New York corporation with its principal place of business in that state.

■ Therefore, without attempting to determine which factors should be given the most weight, it can be seen that virtually all of the points of contact in the transactions giving rise to this dispute are with the United States. Some are Liberian, but no one contends that Liberian law should apply. The only British contacts are the registration and nominal ownership of the vessel at the time the charter party was breached. These British interests, however, are overshadowed by the fact that the real owners of the vessel, namely Windjammer and Burke, were American, and it is well settled that the courts will look through the facade of foreign registration and incorporation to the American ownership behind it, Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970); Bartholomew v. Universe Tankships, Inc., 263 F.2d 437, 442 (2 Cir.) cert. denied, 359 U.S. 1000, 79 S.Ct. 1138, 3 L.Ed.2d 1030 (1959).

An additional reason for applying American law in this case is that the only party who does not want to use that law is Empire, an American corporation whose claim is based upon a note that stipulates the use of American law. Thus, if there were any doubt on the choice of law point, it could certainly be resolved against a United States citizen who wished to avoid its own country's laws, cf. Lauritzen, supra, 345 U.S. at 587, 73 S.Ct. 921.

Because there are sufficient factors for using American maritime law, rather than the British law of the flag, cf. Tjonaman, supra, 340 F.2d at 291, we turn now to a consideration of that law.

The arbitration award gave Rainbow damages on all five of its claims: (1) that the vessel did not make the speed guaranteed in the charter; (2) that prepaid charter hire was not refunded; (3) that advances for supplies made by the charterer on the owner's account were not reimbursed; (4) that it was not indemnified against a claim by a shipper for cargo not carried because of the withdrawal of the vessel from charter; and (5) that it was not reimbursed for its expenses in attempting to arrest the vessel in Tampa. Rainbow, however, only claims a maritime lien for the value of the first four items.

■ The American law is clear that there is a maritime lien for the breach of a charter party,[6] and because the damages sought to be recovered by Rainbow are all of a maritime nature and flow directly from the breach of the charter,[7] it has a maritime lien.

The Supreme Court, in dicta, in The Schooner Freeman v. Buckingham, 59 U.S. 182, 190, 15 L.Ed. 341 (1855), stated that "charterparties, must, in the invariable regular course of . . . business, be made, for the performance of which the law confers a lien on the vessel." The truth of this statement is

---

6. There is no lien if the charter party is merely executory, The Saturnus, 250 F. 407, 408 (2 Cir.) cert. denied 247 U.S. 521, 38 S.Ct. 583, 62 L.Ed. 1247 (1918); The Valmar, 38 F.Supp. 618, 620 (E.D. Pa.1941), but in the present case the vessel had been delivered to the charterer for some ten months and cargoes had been carried. Delivery of the vessel commences the performance of a time charter and removes it from executory status, The Oceano, 148 F. 131, 133 (S.D.N.Y.1906); G. Gilmore & C. Black, The Law of Admiralty, § 9–22, at 521 (1957); and, although it would not matter in this case, we disagree with the court in Belvedere v. Compania Plomari

De Vapores, S.A., 189 F.2d 148 (5 Cir. 1951), to the extent that it felt that a time charter was executory until the first cargo was loaded.

7. Empire argues that even if there is generally a maritime lien for breach of charter, there is none for the specific claims made by Rainbow. For example, Empire states that because a supplier of necessities would not have a lien in this case, then Rainbow should not have one either. Empire misses the point, however, that Rainbow is not suing merely as the subrogee of the supplier but as a party injured by a direct breach of the charter.

borne out by the fact that in rem jurisdiction in the admiralty exists only to enforce a maritime lien, The Resolute, 168 U.S. 437, 440, 18 S.Ct. 112, 42 L.Ed. 533 (1897); The Rock Island Bridge, 73 U.S. 213, 215, 18 L.Ed. 753 (1867), and a breach of a charter party is cognizable as an in rem action, Morewood v. Enequist, 64 U.S. 491, 493–494, 16 L.Ed. 516 (1859); therefore, the breach of a charter gives rise to a maritime lien.

This court in Schilling v. A/S D/S Dannebrog, 320 F.2d 628, 632–633 (2 Cir. 1963), and the Eros, 251 F. 45 (2 Cir), cert. denied 247 U.S. 509, 38 S.Ct. 578, 62 L.Ed. 1242 (1918), has recognized the existence of such a lien, as have other courts, see, e. g., The Oceano, 148 F. 131, 133 (S.D.N.Y.1906); The Port Adelaide, 59 F. 174, 177 (E.D. N.Y.1893), aff'd as modified on other grounds, 62 F. 486 (2 Cir. 1894), and the commentators, Gilmore & Black, supra, § 9–20, at 517; 1 E. Benedict, The Law of American Admiralty, § 96, at 293–94 (6 ed. 1940); Ray, Maritime Contract Liens, 47 Tul.L.Rev. 587, 597 (1973).

█ In an attempt to show that Rainbow should have no lien, Empire argues the injustice of permitting this "secret lien" which weakens the security interest of the mortgagee. Yet, even if it were possible to ignore the heavy weight of precedent which confirms Rainbow's right to a lien, Empire's argument is not persuasive. A maritime lien for breach of charter has priority over the mortgagee only if it has attached before the mortgage was recorded, 46 U.S.C. § 953; and, if there is such a prior lien, the lienor must act quickly or risk being barred by laches from asserting his claim, The Key City, 81 U.S. 653, 660, 20 L.Ed. 896 (1871). Moreover a sophisticated ship mortgagee is well able to devise adequate protection for itself against priority liens,[8] cf., Harmon, Dis-

charge and Waiver of Maritime Liens, 47 Tul.L.Rev. 786, 805 (1973).

The decision of the district court, granting Rainbow a maritime lien, is affirmed.

---

8. Under American ship mortgage law, the mortgagor runs the risk of criminal penalties and civil damages for failure to disclose to the mortgagee the existence of any maritime liens known to him, 46 U.S.C. §§ 924, 941(b), (c).