**BAY CASINO, LLC., Plaintiff,**

v.

**M/V ROYAL EMPRESS, her engines, boilers, tackle, etc., in rem, and Seaco Ltd., CGG Ltd. # 1 and Belair Financial Services, Inc., in personam, Defendants.**

No. 98 CV 2333 SJ.

United States District Court,
E.D. New York.

Aug. 19, 1998.

Burlingham Underwood LLP, New York, NY by Terry L Stoltz, for Plaintiff.

Healy & Baillie, LLP, New York, NY by John C. Koster, Andrew V. Buchsbaum, for Defendants.

*AMENDED MEMORANDUM & ORDER*

JOHNSON, District Judge.

### Introduction

This matter is currently before the Court on Defendants' application, pursuant to Rule E(4)(f) of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Supplemental Rules"), to vacate the arrest and attachment of the M/V ROYAL EMPRESS, and to allow Defendants to post a $ 200,000 bond instead. Defendants have also moved this Court pursuant to Supplemental Rule E(7) to require Plaintiff to post a $1,069,000 bond as security for their proposed counter- and cross-claims. On April 2, 1998, the Court conducted an evidentiary hearing and directed the parties to submit proposed findings of fact and conclusions of law. The following constitutes the Court's findings of fact and conclusions of law. For the reasons discussed below, the warrant of arrest and process of maritime attachment and garnishment are upheld and Defendants' motion to vacate is DENIED.

## FINDINGS OF FACT

### A. *The Parties*

1. Plaintiff Bay Casino, LLC ("Bay Casino" or "Plaintiff" or "Charterer") is a limited liability company organized under the laws of the State of Delaware with its office and principal place of business located at 3202 Emmons Avenue, Brooklyn, New York 11235. Verified Complaint at ¶ 2. Bay Casino has been granted a shipboard gambling license by the New York City Gambling Control Commission.

2. Defendant CGG Ltd. # 1 ("CGG") is a Florida limited partnership having its principal place of business at Tampa, Florida. Joint Venture Agreement between CGG and Belair Financial Services, Inc.("Joint Venture Agreement"); Plaintiff's Hearing Exhibit 1.

3. Defendant Belair ("Belair") is a Delaware corporation having its principal place of business located at Fort Lauderdale, Florida. Joint Venture Agreement at p. 1.

4. Defendant SeaCo Ltd ("SeaCo" or "Defendant" or "Owner") is a joint venture and unincorporated business association with its office and principal place of business located at Tampa, Florida. SeaCo is comprised of CGG and Belair ("Defendants"). Joint Venture Agreement at p. 1; Hearing at 21—22. The Joint Venture Agreement is dated January 15, 1998, is signed by Buddy Levy, and one of its general purposes was to acquire the M/V Royal Empress—the vessel at issue in the instant case. *Id.*

5. The M/V ROYAL EMPRESS (the "Vessel") is a passenger vessel owned by SeaCo and registered under the laws of St. Vincent and the Grenadines currently within the jurisdiction of this Court and subject to a warrant of arrest and process of maritime attachment and garnishment pursuant to the Supplemental Rules. Verified Complaint ¶ 3; Warrant of Arrest filed 3/27/98; Process of Maritime Attachment and Garnishment filed 3/27/98; Joint Venture Agreement at p. 1; Claim of Owner filed by Seaco April 3, 1998. SeaCo purchased the Vessel in January of 1998 for five million dollars with the purpose of placing it at Sheepshead Bay with Bay Casino in order to operate it as a gaming ship. Hearing at 23—24. The Vessel was certified by the Florida office of the United States Coast Guard to carry 896 passengers. Hearing at 46. The Vessel is not certified in New York. Hearing at 47, 51.

6. At all relevant times, Buddy Levy was the Manager of Defendant SeaCo and at the same time, until his termination on March 27, 1998, the Chief Executive Officer of Plaintiff Bay Casino. Levy is also the President of Coastal Gaming Group, Inc. ("CGGI")—a general partner of CGG. Levy testified before the Court at the Hearing and also submitted an affidavit sworn to April 1, 1998. ("Levy Aff."). In connection with the charter, Levy made six trips to New York from Tampa, Florida between January and April of 1998. Hearing at 37.

7. Joseph Kelleher is Executive Vice President of Plaintiff Bay Casino. He also testified at the Hearing and he submitted two affidavits sworn to April 1, 1998 and April 9, 1998, respectively. ("Kelleher Affs.").

8. Gold Star Casinos Inc. ("Gold Star") is a Florida company that is involved in the shipboard management of casinos. Hearing at 33. On December 17, 1996, Bay Casino had entered into an exclusive contract with Gold Star at the inception of the Liberty I cruises. Kornblum Affidavit ¶ 13.

### B. *Background*

9. Commencing in or about December, 1996, Plaintiff Bay Casino began operation of shipboard gambling cruises on board the vessel Liberty I departing from a pier leased by Plaintiff in Sheepshead Bay, Brooklyn. Hearing at 7. The pier facility is zoned at two hundred passengers pursuant to a New York City zoning ordinance. *Id.* Originally, the Liberty I sailed with two hundred passengers. However, between July 2, 1997 and November 3, 1997 when its operations were suspended, the boat sailed with four hundred passengers per cruise. *Id.* at 7—8. The Liberty I was able to increase its passenger capacity after a permanent floatable barge was employed by Plaintiff. This barge brought the vessel outside the pier headline and excluded it from being covered by the zoning ordinance. *Id.*

10. On or about June 26, 1997, in response to "cruises to nowhere" that operate from New York City locations, the Council of the City of New York passed a Local Law amending the administrative code of the City of New York which, in part, established the New York City Gambling Control Commission and established licensing procedures and regulations for applicants seeking to conduct shipboard gambling businesses. Defendants' Exhibit 4 to Proposed Findings.

11. On January 8, 1998, Bay Casino filed a Shipboard Gambling Business License Application ("Shipboard Gambling Application") with the New York City Gambling Control Commission. The Shipboard Gambling Application was signed by Levy as Chief Executive Officer of Bay Casino. Hearing at 23 and Defendants' Exhibit 5 to Proposed Findings.

12. On or about February 11, 1998, SeaCo filed a Key Vendor Application for License ("Key Vendor Application") with the New York City Gambling Control Commission. The Key Vendor Application was signed by Levy as General Manager of SeaCo. Defendants' Exhibit 6 to Proposed Findings.

13. SeaCo's Key Vendor Application, signed by Levy, lists "Applicant's [defendant SeaCo] business address within New York City" as 3202 Emmons Avenue, Brooklyn, N.Y. 11235, which is Bay Casino's address, and also lists two Brooklyn telephone numbers for SeaCo. One of the Brooklyn telephone numbers listed on SeaCo's Key Vendor Application (718–368–9000) is identical to a telephone number listed on the Shipboard Gambling Application filed by Bay Casino. Defendants' Exhibit 5 to Proposed Findings at 2; Defendants' Exhibit 6 to Proposed Findings at 2.

14. SeaCo's Key Vendor Application, signed by Levy, lists Levy as the designated agent for service of process and his address for service of process as 7439 E. Hillsborough Avenue, Tampa, Florida, 33610. Defendants' Exhibit 6 to Proposed Findings at 4.

## C. *The Bare Boat Agreement*

15. Pursuant to an agreement entitled "Bare Boat Charter Party" dated January 29, 1998 (hereinafter "Bare Boat Agreement"), SeaCo as Vessel "Owner agrees to let and demise and Charterer agrees to hire the passenger vessel Royal Empress ... to be renamed Liberty II" for an initial term of 3 years. Bare Boat Agreement ¶ 1; 5.1. The Bare Boat Agreement was signed by Levy, Manager of SeaCo, as "Owner" on February 10, 1998 and by Joseph Kelleher, COO of Bay Casino, as "Charterer" on February 8, 1998. *Id.* at p. 15.

16. Pursuant to the Bare Boat Agreement, Levy was appointed Chief Executive Officer of Bay Casino while at the same time continuing in his role as the "exclusive" Manager of defendant SeaCo. Hearing at 23.

17. The Vessel was to be delivered to and accepted by the Charterer no later than February 17, 1998—in which event Charterer could terminate Charter at its option. *Id.* ¶ 2. The Vessel was to be complete with mechanical and cosmetic upgrades, fully operable in class, and Coast Guard Certified for New York City use. *Id.* ¶¶ 3, 7.1. Acceptance of the Vessel by Charterer was to be conclusive proof as to the Vessel's compliance with the Charter, subject to latent defects. *Id.* ¶ 3.

18. Charterer was to have posted in a conspicuous place on the Vessel a notice reading in relevant part: THIS VESSEL IS OWNED BY SEACO, LTD. AND IS UNDER DEMISE CHARTER TO BAY CASINO, LLC. *Id.* ¶ 9.

19. Charterer was to have "full use and exclusive possession and control of the vessel ...." *Id.* ¶ 4. Charterer was to man, supply, equip. upkeep, navigate, and operate the Vessel at its own expense. *Id.*

20. The provision for "charter hire" required that Bay Casino as Charterer pay the sum of $5,500 per day to SeaCo commencing "on and from the day and hour of her initial revenue voyage ...." *Id.* ¶ 3; Hearing at 18. Bay Casino's failure to pay "charter hire" would not be deemed a default under the Bare Boat Agreement until only after the first 12 months that charter hire was due.

Bare Boat Agreement ¶ 3; Hearing at 41—42.

21. The Vessel never undertook any "revenue voyages" as defined under the Bare Boat Agreement and no charter hire was ever earned or paid. Hearing at 19.

22. Under the Agreement, Charterer would have been paid a monthly "Dock Fee" of $ 7.50 for each revenue passenger. Bare Boat Agreement ¶ ¶ 16.3; 17(b).

23. The Bare Boat Agreement required SeaCo to "advance certain funds and credits for the benefit of Charterer" as follows:

A "bank" for casino operations in the amount of $250,000 (¶ 15.8(a)(1));

A cash advance "sufficient to cover all working capital requirements of the Charterer's operations, including the Casino operation, Charter Hire and dock fee ... in the amount of $100,000 as an advance of initial working capital and in the amount of $150,000 as an additional advance due February 13, 1998." (¶ 15.8(a)(2));

As "Special Advances" against dock fees, $150,000 in cash, and upon execution of the Bare Boat Agreement, an additional $150,000 cash advance, and on February 13, 1998, a further $200,000 advance, totaling $500,000. (¶ 15.8(a)(3)). These Special Advances were to be repaid to owner in 36 monthly installments, provided the vessel was on hire. (¶ 17).

24. The Bare Boat Agreement also provided that SeaCo would share in the profits by being paid a "Consulting Fee" based on 75% of the Net Operating Revenue, calculated by subtracting Operating Expenses and Dock Fees from Gross Revenues. "Gross Revenues" were defined to include revenue from shoreside operations, such as cash machines, and a possible gift shop. Bare Boat Agreement ¶¶ 16.1–16.2, 16.4; Hearing at 19, 41—42.

25. Additionally, the Bare Boat Agreement required that Plaintiff, as Charterer, at its sole cost and expense, obtain and pay for all insurance on the Vessel. Bare Boat Agreement ¶ ¶ 10.1; 11.

26. SeaCo was to provide casino consulting services by designating two of the four Casino Management Committee members.

*Id.* ¶ 15.2(b)(1). However, Bay Casino was to nominate the Casino Manager and all other Casino personnel. *Id.* ¶ 15.2(a). SeaCo was to make available to Bay Casino certain services relating to the recruiting and recommendation for hiring suitable employees for food and beverage services, or alternatively, at Bay Casino's request, was to identify and recruit a suitable concessionaire to provide those services. SeaCo was also permitted to negotiate a food and beverage concession agreement. *Id.* ¶ 15.4.

27. SeaCo also was to "recruit and recommend for hiring suitable employees for all terminal operations and other shoreside services," was empowered to "identify and recruit" a suitable contractor to provide such services, and was authorized to "negotiate a services agreement on behalf of Charterer" for provision of such services. *Id.* ¶ 15.4.

28. Finally, Owner was obligated to "make available and provide consulting services to Charterer with respect to all purchasing of fuel, lubricants, other consumables, materials, supplies, food and beverages, furniture and equipment and all other articles of any nature whatsoever for use by or on [sic] onboard the Vessel." Bay Casino was allowed to appoint SeaCo "as its limited purpose agent to effect purchases of such materials, supplies and equipment." *Id.* ¶ 15.6.

29. The Charter stated that the Charter Party shall be governed by New York law and that the parties submit to the exclusive jurisdiction and venue of the courts of the United States and the State of New York. *Id.* ¶ 23.4

30. Levy testified at the hearing that he believed he had a joint venture agreement with Bay Casino when he signed the Charter. Hearing at 24. On February 2, 1998. Levy, acting in his capacity as Manager of SeaCo, sent a letter to Michael Kornblum, principal of Bay Casino, wherein Levy described the Bare Boat Agreement as follows:

Of a more serious nature are some changes which are probably necessary [to the Bare Boat Agreement] because of the unusual relationship which exists between Bay Casinos and SeaCo. Clearly, this is not the

normal charter agreement and upon further review it appears to me that certain amendments should be considered to properly reflect the type of relationship which actually exists.

What has been created by this Charter Agreement is not only a charter for hire, but also a joint venture arrangement whereby operational control and profit divisions are provided.

Exhibit 8 to Defendants' Proposed Findings at 2; Hearing at 24—25.

31. Levy never received a response to his letter. Hearing at 25—26.

32. The Bare Boat Agreement was terminated by a telefaxed letter dated March 27,- 1998 from Kornblum at Bay Casino to Levy at SeaCo. Defendants' Exhibit 9 to Proposed Findings. The reasons given for the termination were "the various defaults and prior writings to date." *Id.*

33. Levy was terminated "for cause" as CEO of Bay Casino via a telefaxed letter dated March 27, 1998. Exhibit 4 to Levy Affidavit.

### D. *Defendants' Alleged Breach and Plaintiff's Termination of the Bare Boat Agreement*

34. Pursuant to the terms of the Bare Boat Agreement, the Vessel was required to be "delivered to and accepted by [Bay Casino] as soon as possible, but in no event later than February 17, 1998 at the Port of New York ...." Additionally, the Bare Boat Agreement gave Plaintiff the right to terminate the Charter "[i]n the event of non-delivery of the Vessel on or before February 17, 1998." Bare Boat Agreement ¶¶ 2, 5.2(a)(10).

35. The Bare Boat Agreement also gave the Bay Casino the right to terminate the Charter if (1) the operation of the Vessel or casino did not conform to any applicable laws or regulations; (2) non-payment of the monthly dock fee in a timely manner; (3) owner failed to provide sufficient working capital required in a timely manner; (4) Coastal Gaming ceased to own at least 50 percent of owner; (5) Levy was no longer exclusive manager of owner; (6) owner breached its obligations to provide cash advances for working capital and advance dock fees in a timely manner; (7) owner materially breaches any warranties and representations of the charter; and (8) Levy was terminated with cause from CEO position of Bay Casino. *Id.* ¶ 5.2(a)(1)-(8).

36. The Vessel was not delivered in New York until on or about February 26, 1998. It was "conditionally delivered" to Plaintiff on February 26, 1998 but was not in the condition required by the charter. Verified Complaint at ¶ 7.

37. When delivered in New York on February 26, 1998, the Vessel was not Coast Guard Certified for operations in New York. Hearing at 47. At the hearing, Kelleher testified that she was still uncertified and therefore could not carry any passengers. *Id.* at 6.

38. Before the Coast Guard will certify the Vessel it is requiring that two lifeboats be repaired, that a telephone be repaired, and that it undergo a sea trial of her maneuverability. Kelleher Aff. ¶¶ 17; 21; Hearing at 9

39. The owner, SeaCo, is responsible for the Coast Guard certification. *Id.* at 9.

### CONCLUSIONS OF LAW

#### A. *Jurisdiction*

1. This Court has subject matter jurisdiction of this matter based upon the admiralty and maritime jurisdiction of the United States. 28 U.S.C. § 1333; U.S. Const. Art. III., § 2, cl. 1; *California and State Lands Comm. v. Deep Sea Research,* — U.S. —, —, 118 S.Ct. 1464, 1469, 149 L.Ed.2d 626 (judicial power of federal courts extends to all cases of admiralty and maritime jurisdiction)

#### B. *Overview of In Rem and In Personam Proceedings in Admiralty*

██ 2. Under the admiralty law of the United States, *in personam* and *in rem* actions may arise from the same claim, and may be brought separately or in the same suit. Supplemental Rule C(1)(b). As its name implies, the *in personam* action is filed

against the owner personally, whereas the *in rem* action is filed against the res, the vessel—a maritime lien on the vessel being a prerequisite to an action *in rem.* *Belcher Co. of Alabama, Inc. v. M/V Maratha Mariner,* 724 F.2d 1161, 1163 (5th Cir.1984), citing G. Gilmore & C. Black, The Law of Admiralty 685 (2d ed.1975), § 1—12 at 35. *Quasi in rem* actions are based on a claim for money and initiated by an attachment or other seizure of property when the court has no jurisdiction over the person of the defendant, but has jurisdiction over a thing belonging to him. Supplemental Rule E; *Belcher,* 724 F.2d at 1163—1164.

3. The distinction between these types of proceedings is explained by the Supplemental Rules. Attachment issues "with respect to any admiralty or maritime claim *in personam* and its purpose is to attach the defendant's goods or chattels or other assets if the defendant shall not be found in the jurisdiction." *Belcher,* 724 F.2d at 1164; Supplemental Rule B. In contrast, an action *in rem* is available only to enforce a maritime lien and the arrest warrant extends only to the vessel. *Id.;* Supplemental Rule C. In the instant case, Plaintiff has filed an *in rem* action against the vessel and an *in personam* action against SeaCo, CGG, and Belair. Verified Complaint.

4. In both *in rem* and *in personam* proceedings involving seized vessels, the vessel is seized, may be released and substituted for security, and may later be sold to satisfy a judgment. *Belcher,* 724 F.2d at 1165.

5. However, in the *in rem* proceeding, the owner of the vessel bears no personal liability. The vessel is sold to satisfy the lien. If the proceeds of the sale of the vessel are inadequate to cover the lien, the owner is not liable for the balance. *Id.* In contrast, in the *in personam* proceeding (the attachment action), the vessel is seized only to compel the owner's appearance and if the proceeds of the sale of the vessel do not satisfy the judgment, the owner remains liable for the balance of the amount. *Id.*

6. Rule C allows *in rem* and *in personam* causes of action to be tried in the same proceeding, where appropriate. *Do-*

*well Division of the Dow Chemical Co. v. Franconia Sea Transport, Ltd.,* 504 F.Supp. 579, 582 (S.D.N.Y.1980), aff'd. 659 F.2d 1058 (2d Cir.1981), *cert. denied,* 454 U.S. 941, 102 S.Ct. 478, 70 L.Ed.2d 249. When a maritime lien attaches, the plaintiff may pursue an *in rem* action against the vessel and the plaintiff may also bring an *in personam* action against the defendant who is allegedly liable in contract, tort, etc. *Id.* The two rules may be invoked simultaneously, as they are here. *Amstar Corp. v. S/S Alexandros T.,* 664 F.2d 904, 906 (4th Cir.1981); *Navieros Inter-Americanos, S.A., v. M/V Vasilia Express,* 120 F.3d 304 (1st Cir.1997).

## C. *Rule C Arrest of the Vessel*

7. Supplemental Rule C allows an action *in rem* to "enforce any maritime lien."

8. It is well-settled that although arrest of maritime property is a remedy available within the maritime jurisdiction, it requires an underlying maritime cause of action supporting a maritime lien in the property arrested. Thus, the only basis for the arrest of a vessel *in rem* is the enforcement of a maritime lien in favor of the party suing the vessel and seeking the arrest. *Rainbow Line, Inc. v. M/V Tequila,* 480 F.2d 1024, 1027–28 (2d Cir.1973); *Marubeni America Corp. v. M/V Unity,* 802 F.Supp. 1353, 1355 (D.Md.1992) (citing Gilmore and Black, The Law of Admiralty § 9–19).

9. In order to avail itself of the device of maritime arrest, a plaintiff has the burden of showing that it is entitled to a maritime lien; if it cannot do so, the arrest fails and must be dissolved. *See* Supplemental Rule E(4)(f) (stating that the plaintiff "shall be required to show why the arrest or attachment should not be vacated").

## I. *Joint Ventures and Maritime Liens*

10. Under well-established maritime law, one who is a joint venturer does not have a maritime lien, and cannot enforce one against his co-venturer. *Sasportes v. M/V Sol de Copacabana,* 581 F.2d 1204, 1208 (5th Cir.1978). A co-venturer may only entertain an *in personam* action against the vessel owner for claims arising out of their

mutual joint venture. A co-venturer may not lawfully have a maritime lien against the ship itself. *Sasportes,* 581 F.2d at 1208–9.

■ 11. The rationale for this established doctrine is that a co-venturer is not a "stranger to the vessel," and therefore relies not upon the credit of the ship, but rather upon the credit of the owner for payments, claims and reimbursement. *Vera, Inc. v. The Tug Dakota,* 769 F.Supp. 451, 457 (E.D.N.Y. 1991).

■ 12. In New York, in order to form a joint venture, all of the following elements must be met: (1) two or more persons must enter into a specific agreement to carry on an enterprise for profit; (2) their agreement must evidence their intent to be joint venturers; (3) each must make a contribution of property, financing, skill, knowledge, or effort; (4) each must have some degree of joint control over the venture; and (5) there must be a provision for the sharing of both profits and losses. *Itel Containers International Corp., v. Atlanttrafik Express Service Ltd.,* 909 F.2d 698, 701 (2d Cir.1990); *Independent Energy Corp. v. Trigen Energy Corp.,* 944 F.Supp. 1184, 1201 (S.D.N.Y.1996).

13. "The ultimate inquiry [in determining whether a joint venture exists] is whether the parties have so joined their property, interest, skills and risks that for the purposes of the particular adventure their respective contributions have become as one and the commingled property and interests of the parties have thereby been made subject to each of the associates on the trust and inducement that each would act for their joint benefit." *Independent Energy Corp. v. Trigen Energy Corp.,* 944 F.Supp. 1184 (S.D.N.Y.1996).

■ 14. The finding of a joint venture is predicated on an examination of the entire relationship between the parties; no one factor is considered decisive. *Fulcher's Point Pride Seafood,* 935 F.2d at 211–12; *Sasportes,* 581 F.2d at 1207.

■ 15. In this case, the Court finds that the parties had a owner-charterer relationship under the Bare Boat Agreement, and not a joint-venture as Defendants argue.

First, all five elements required to be in existence under New York law in order to find a joint venture have not been shown to exist in the parties' Charter. First, although there was sharing of profits under the Agreement, there was no sharing of losses. Second, although under the agreement SeaCo was to contribute skills, knowledge, and financing, the Bare Boat Agreement did not evidence a mutual intent to be joint venturers as the second element requires. The Agreement is entitled "Bare Boat Charter Party" and in numerous places refers to SeaCo as "Owner" and to Bay Casino as "Charterer." Not withstanding Levy's claims in his February 2 letter to Kornblum that the Agreement was "not only a charter for hire, but also a joint venture arrangement," Levy signed the Agreement on February 10, 1998 without the changes he had requested to reflect a joint venture arrangement. In addition, just approximately one month earlier Leyy had signed an agreement between CGG and Belair which established SeaCo as a joint venture with its purpose as the purchase of the M/V Royal Empress. Plaintiff's Hearing Exhibit 1. In comparing the two documents, many differences are apparent. Unlike the Bare Boat Charter Agreement, the agreement between CGG and Belair is entitled and referenced throughout as a "Joint Venture Agreement." Furthermore, it refers to the parties throughout the document as the "parties" and as "joint venturers," and not as "owner" or "charterer" as SeaCo and Bay Casino are described in the Bare Boat Charter. Furthermore, there is an explicit provision for the sharing of both profits and losses. *Id.* at ¶ 2.2. Finally, the Bare Boat Charter required Bay Casino to post a visible notice stating that the Vessel was owned by SeaCo and was under a demise charter to Bay Casino. For these reasons, the Court holds that Plaintiff and Defendants did not have a joint venture agreement.

## II. *Maritime Liens Arising from Breach of Charter Party*

■ 16. The term "charter party" refers to the document setting forth the terms of a contract when one person (the "charterer") takes over the use of the whole ship

belonging to another ("the owner"). G. Gilmore & C. Black, supra, at 193, *cited in Int'l Marine Towing, Inc. v. Southern Leasing Partners, Ltd.*, 722 F.2d 126, 130 (5th Cir. 1983), *cert. denied sub nom, First Miss. Nat'l Bank v. Int'l Marine Towing Inc.*, 469 U.S. 821, 105 S.Ct. 94, 83 L.Ed.2d 40 (1984).

17. There are three types of charter parties: the first two, the "voyage charter" and the "time charter," occur when the vessel is manned and navigated by the owner. *Id.* The third charter, the "bareboat" or "demise charter," occurs when the charterer operates the ship and is regarded as the owner of the ship *pro hac vice. Id.* The charter in the instant case belongs to this third category.

18. Under the executory contract doctrine, a charterer has a maritime lien against an owner once performance of the charter contracts begins. In other words, there can be no maritime lien for breach of an executory contract. *Rainbow Line, Inc. v. M/V Tequila*, 480 F.2d 1024, 1027 n. 6 (2nd Cir.1973).

19. With respect to time charters, courts are in agreement that delivery of the vessel to a time charterer commences the performance of a time charter and removes it from executory status. *Rainbow Line*, 480 F.2d 1024, *Int'l Marine Towing*, 722 F.2d at 126.

20. However, in the case of the bareboat charter, there is a "dearth of case law" and discussions in treatises are "equally oblique." *Int'l Marine Towing*, 722 F.2d at 130 n. 7.

21. In *Int'l Marine Towing*, the Court explained in a footnote the differences between when performance begins in a time charter as opposed to a bareboat charter: "Delivery of the vessel commences the performance of a time charter and removes it from executory status. Delivery of the vessel to the charterer and its use by the same also commences the performance of a bareboat charter as so to remove its executory status." 722 F.2d at 131 n. 8. However, in a later case, the Court stated in dictum that in relying on the Second Circuit's reasoning in *Rainbow Line, Inc. v. M/V Tequila*, 480 F.2d at 1027 n. 6, it noted that a bareboat charter

"ceases to be executory when the vessel is delivered to the charterer." *E.A.S.T., Inc. of Stamford, Conn. v. M/V Alaia*, 876 F.2d 1168, 1175 (5th Cir.1989), rehearing and rehearing en banc denied.

22. In an earlier Eastern District of New York case involving a bareboat charter arrangement for a tug boat, the Court held that a maritime lien existed and the bareboat charter was no longer executory "since it was delivered to the charterer ...." *Petersen Towing Corp. v. Capt. Abrams, Inc.*, 388 F.Supp. 1166, 1169—1170 (E.D.N.Y.1975), cited as persuasive authority in *Int'l Marine Towing*, 722 F.2d at 131. *See also Florida Yacht Brokers, Inc. v. Yacht Huckster*, 249 F.Supp. 371 (S.D.Fla.1965) (finding that breach of bareboat charter by owner gave rise to maritime lien), also cited as persuasive authority by the Fifth Circuit in *Int'l Marine Towing*.

23. The Court finds that in the case at bar, the charter was no longer executory because the boat had been delivered to and accepted by Bay Casino. In addition, between February 4th and March 6th, SeaCo had made advances and payments to Bay Casino for working capital. *See* § E, "Damages," below. Therefore, because the charter was no longer executory, SeaCo's alleged breach of the demise charter gave rise to maritime liens by unpaid vendors. Thus, Defendants' motion to vacate the Rule C arrest of the vessel is denied.

## D. *Process of Maritime Attachment and Garnishment*

24. Supplemental Rule B authorizes, in admiralty and maritime cases, attachment of a defendant's assets as a means of obtaining jurisdiction over a defendant when he cannot be "found" within the federal district in which the attachment is sought. The purpose of Rule B is to enable the plaintiff both to acquire jurisdiction over the defendant and obtain security for any resulting judgment. *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206 (1950). Attachment may not be utilized solely for the purpose of acquiring security. *Chilean Line*

*Inc. v. United States,* 344 F.2d 757, 760 (2d Cir.1965); *Seawind Compania, S.A. v. Crescent Line, Inc.,* 320 F.2d 580, 582 (2d Cir. 1963).

25. Rule B provides:

**Rule B. Attachment and Garnishment: Special Provisions**

**(1) When Available; Complaint, Affidavit, Judicial Authorization, and Process.** With respect to any admiralty or maritime claim in personam a verified complaint may contain a prayer for process to attach the defendant's goods and chattels, or credits and effects in the hands of garnishees to be named in the process to the amount sued for, if the defendant shall not be found within the district. Such a complaint shall be accompanied by an affidavit signed by the plaintiff or the plaintiff's attorney that, to the affiant's knowledge, or to the best of the affiant's information and belief, the defendant cannot be found within the district.

26. Because jurisdiction over the person is gained only through the attached property, Rule B jurisdiction is *quasi in rem* in nature. *Limonium Maritime, S.A., v. Mizushima Marinera, S.A.,* 961 F.Supp. 600, 605 (S.D.N.Y.1997), citing *Maryland Tuna Corp. v. M/S Benares,* 429 F.2d 307, 311 (2d Cir.1970) (Rule B attachment is *quasi in rem* proceeding).

27. Courts have enunciated a two-prong test to determine whether a defendant is "found within the district" for purposes of a Supplemental Rule B attachment: (1) can the foreign defendant be found within the district in terms of jurisdiction, and (2) can the defendant be found for service of process. *Seawind Compania, S.A. v. Crescent Line, Inc.,* 320 F.2d 580, 582 (2d Cir.1963); *Navieros Inter–Americanos v. M/V Vasilia Express,* 120 F.3d 304, 314–15 (1st Cir.1997). In other words, the defendant must be able to accept process as well as being " 'engaged in sufficient activity in the district to subject it to jurisdiction even in the absence of a resident agent expressly authorized to accept process.' " *VTT Vulcan Petroleum v. Langham–Hill Petroleum, Inc.,* 684 F.Supp. 389 (S.D.N.Y.1988), quoting *Seawind,* at 583.

28. The party that has obtained the attachment bears the burden of showing its validity. *See* Supplemental Rule E(4)(f).

**I.** *First Prong: Found Within District in the Jurisdictional Sense*

29. A defendant corporation is found within jurisdiction of a federal district court if in the recent past it has conducted substantial commercial activities in the district and will probably continue to do so in the future. *United States v. Cia Naviera,* 178 F.Supp. 561 (S.D.N.Y.1959); *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Such substantial business includes sending a vessel into the district. *Navieros Inter–Americanos, S.A. v. M/V Vasilia Express,* 120 F.3d 304, 315 (1st Cir.1997).

30. The Second Circuit has held that when a contract that is at issue in a law suit had been made and breached in a State, personal jurisdiction exists over the foreign defendant in that particular State. *See Seawind,* 320 F.2d at 583 (corporation's activities in making contract in New York and allegedly breaching it in New York made the corporation subject to suit in New York), *See also VTT Vulcan,* 684 F.Supp. at 392 ("*Seawind* stands for the proposition that where a contract, which is the subject of a lawsuit, has been made and allegedly breached in the jurisdiction where attachment is sought, the contract can provide continued 'jurisdictional presence' even after the defendant has physically terminated other contacts with the jurisdiction").

31. In addition, a forum selection clause provides a basis for exercise of *in personam* jurisdiction. See *M/S Bremen v. Zapata Off-Shore,* 407 U.S. 1, 9–10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) (A forum-selection clause is tantamount to consent to jurisdiction in a particular forum); *Maritime Ventures Int'l Inc. v. Caribbean Trading & Fidelity, Ltd.* 689 F.Supp. 1340, 1348 (S.D.N.Y.1988), *recons. denied,* 722 F.Supp. 1032 (S.D.N.Y.1989) ("The Supreme Court has held that a federal court sitting in admiralty should give full effect to forum-selection clauses").

32. The Court finds in the case at bar, that SeaCo was found within the district in the jurisdictional sense because it had conducted substantial commercial activities in the district by sending the Vessel into the district, by sending payments to Plaintiff, and by executing and breaching the charter in New York. In addition, the Charter contained a forum selection clause whereby the parties consented to suit in New York. However, even if a foreign defendant "is found to be within the district in the jurisdictional sense, its property is not immune from attachment." *Navieros,* 120 F.3d at 315, quoting *United States v. Cia. Naviera Continental S.A.,* 178 F.Supp. 561, 563–64 (S.D.N.Y. 1959). The fact that the defendant is present in the jurisdictional sense will not suffice, if he cannot be found for service of process within the district (the second prong of the test). *Integrated Container Service, Inc. v. Starlines Container Shipping, Ltd.,* 476 F.Supp. 119, 122 (S.D.N.Y.1979). This is because Rule B's purpose is two-fold: (1) to assure defendant's appearance and (2) to assure satisfaction in case the suit is successful. A post-attachment appearance may later moot the first purpose, but it does not address the second. *Id.,* citing *Swift v. Compania Colombiana,* 339 U.S. 684, 693–95, 70 S.Ct. 861, 94 L.Ed. 1206 (1950).

## II. *Second Prong: Found Within District for Service of Process*

33. A party seeking a Rule B attachment must make a bona fide effort to find its adversary in the district. *Seawind,* 320 F.2d at 583, but it is not necessary that an exhaustive search be conducted. *Royal Swan Navigation Co. v. Global Container Lines, Ltd.,* 868 F.Supp. 599, 603 (S.D.N.Y. 1994).

34. The presence of a transient individual almost once a week at a certain office within the district has been held to be insufficient to satisfy the second prong of the test. *Royal Swan,* 868 F.Supp. at 603.

35. In addition, the mere known presence of an agent authorized to accept process does not, by itself, preclude foreign attachment. *Antco Shipping Co. v. Yukon Compania Naviera,* 318 F.Supp. 626, 628

(S.D.N.Y.1970), citing *Seawind,* 320 F.2d at 583.

36. This Court finds that Plaintiff made reasonable efforts to find Defendants in the district, but that Defendants' presence in the district was not sufficient to satisfy the second prong of the test. Levy had only been within the district six times over the course of approximately three months. Furthermore, his designated address for service of process on behalf of SeaCo was in Florida. Finally, Kelleher of Bay Casino was unable to reach Levy after March 20th. Kelleher Supplemental Affidavit ¶ 3. Levy did not return any of Kelleher's phone calls during the week of March 23rd. *Id.*

37. Therefore, because Defendants could not be found in this district for service of process, Defendant's motion to vacate the attachment is denied.

## E. *Damages* (The Court addresses this issue only for the purpose of determining whether the attachment of the Vessel is appropriate as security. The actual determination of damages will be ascertained at trial by the fact finder).

38. It is well-settled that in attachment proceeding, the plaintiff need not prove its damages with exactitude but the court must be satisfied that the plaintiff's claims are not frivolous. *Dongbu Express Co. v. Navios Corp.,* 944 F.Supp. 235 (S.D.N.Y.1996).

39. Bay Casino is seeking to recover damages under three categories: unpaid working capital, indemnity for maritime liens, and lost revenues.

40. Defendant failed to provide working capital to Plaintiff. Kornblum Affidavit ¶ 30.

(a) On February 4, 1998, SeaCo made an initial advance of $100,000 that was due on the signing of the Bare Boat Agreement. Kelleher Aff. ¶ 9.

(b) On February 11, Bay Casino requested an additional $300,000 advance. Kelleher Aff. ¶ 9 & Ex. 2.

(c) On February 13, SeaCo made a partial payment of $60,000 and on February 20 and 25, SeaCo made further partial pay-

ments of $100,000 and $50,000. Kelleher Aff. ¶ 9.

(d) On February 27, 1998, Bay Casino demanded an additional $400,000 for working capital. On March 5 and 6, Plaintiff received partial advances of $100,000 and $60,000. Kelleher Aff. ¶ 11.

(e) On March 18, Plaintiff demanded a working capital advance of $200,000, which was allegedly never made and as a result, Bay Casino failed to meet its payroll obligations. Kelleher Aff. ¶ 9.

(f) As alleged by Plaintiff, at the time of the Hearing the amount allegedly owed for working capital was $724.893. Kelleher Aff. ¶ ¶ 13, 23 and Exhibit 6.

41. As alleged by Plaintiff, the amount for unpaid vendors with maritime liens is $ 639,457. Kelleher Aff. ¶ ¶ 14, 15, 24 and Exhibits 8 and 9; Hearing at 17.

42. The amount of lost revenue claimed by Bay Casino is $ 12,177,584—which is comprised of dock fees and twenty-five percent of casino profits. Hearing at 17; Kelleher Affidavit ¶ 25 and Exhibit 10. This number is derived from the pro forma attached to the Bare Boat Agreement as an exhibit and initialed on every page by both Levy and Kelleher on February 10, 1998. Kelleher Affidavit Exhibit 1; Hearing at 28. The pro forma represented the parties' joint projections as to the level of net revenue to be derived from the charter and was arrived at with input from both Bay Casino and SeaCo. Kornblum Affidavit ¶ ¶ 23—24; Hearing at 45. Levy testified at the hearing that the "pro forma was crucial to the operation of the agreement because it set the parameters under which the parties would have to operate in terms of expenses and funding requirements." Hearing at 28.

43. For the year 1998, the pro forma lists total revenue as $34,472,483 and net revenue as $33,527,034 after total cost of sales of $945,449 is deducted. Total payroll is $9,185,624, total other expenses is $16,735,-539, adding up to a total operating expense of $25,921,163. Pro forma at 1; Hearing at 44. After the expenses are deducted from the net revenue, the EBITDA[1] is $7,605,871. *Id.*

Twenty-five percent of this number is $1,901,467.75.

44. Dock fees of $7.50 per passenger for a three-year period in accordance with the Charter ¶ 16.3 and the pro forma passenger projection add up to $6,473.181. Kelleher Affidavit Exhibit 10. The pro forma projects that for the Year 1998, the average number of passengers per cruise would be 363 and the total number of passengers as 314,364. Pro forma at 2. Although the pro forma indicates that the Vessel's passenger capacity is 800, the projection indicates that each cruise would contain between 252 and 440 passengers. *Id.;* Hearing at 29—30.

45. On February 8, 1998, two days before Levy initialed the pro forma, he sent a fax to Kornblum at Bay Casino questioning why the Vessel was limited to 200 passengers at its inception. Defendants' Hearing Exhibit A; Hearing at 30. In the fax, Levy states that it was his understanding that they could start at 400 passengers and increase to 800 almost immediately. *Id.* In a letter dated March 17, 1998, Kornblum responded to Levy's assertions as follows: "You and I agreed that, although we believe that New York City zoning does not apply, Bay Casino was to resume its casino cruise service 'softly' at an initial capacity of 200 and increase such capacity to 400, 600, and 800 over a 90 day period.... To this end, Bay Casino has consistently indicated to SeaCo that the initial capacity was to be 200, as discussed in our meeting of Wednesday. March 4, 1998, which you were in agreement." Defendants' Hearing Exhibit B; Hearing at 31—32.

46. This Court finds that the numbers in the pro forma to be a reasonable basis for calculating damages. The pro forma was composed by both parties, initialed by both parties, and attached to the Bare Boat Charter Agreement as an exhibit. In addition, because Bay Casino's Liberty I had sailed with 400 passengers during its run, it is reasonable to conclude that the Liberty II would sail with between 252 and 440 passengers as the pro forma estimated.

---

**1.** Earnings before interest, taxes, depreciation and amortization.

47. At this early stage of the litigation, the attachment of the Vessel is reasonable given the extent of the amount of damages claimed by Plaintiff. This Court reminds Plaintiff, however, that it has a continuing duty to mitigate damages.

## CONCLUSION

For the reasons stated above, Defendants' motion to vacate the Rule C arrest of the Vessel and the Rule B attachment of the Vessel is DENIED.

Defendants' request for counter-security in the amount of $1,069,000 related to its proposed counter- and cross-claims will be addressed in a separate opinion. Based on the record currently before it, the Court cannot reasonably determine how much counter-security, if any, Defendants are entitled to obtain from Plaintiff. Therefore, Plaintiff is directed to respond in brief to Defendants' request for counter-security on or before May 22, 1998 and Defendants' reply is to be filed no later than two weeks after receipt of Plaintiff's response.

SO ORDERED.